**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thermon PHILLIPS, E.B. Rich, USX Corporation a/k/a United States Steel Corporation, Defendants–Appellants.**

No. 90–7721.

United States Court of Appeals,
Eleventh Circuit.

May 10, 1994.

**1566**

Albert C. Bowen, Jr., Beddow, Erben &
Bowen, Birmingham, Tommy Nail, Birmingham, AL, for Phillips.

J. Mark White, White, Dunn & Booker,
Birmingham, AL, for Rich.

William N. Clark, L. Drew Redden, Redden, Mills & Clark, Reed, Smith, Shaw &
McClay, Birmingham, AL, W. Thomas
McGough, Jr., Pittsburgh, PA, Leonard L.
Scheinholtz, William Bittman, Reed, Smith,
Shaw & McClay, Washington, DC, J. Michael
Jarboe, Pittsburgh, PA, for USX.

Frank W. Donaldson, U.S. Atty., Birmingham, AL, Michael V. Rasmussen, Asst. U.S.
Atty., for appellee.

Dixie L. Atwater, Ogletree, Deakins, Nash,
Smoak & Stewart, Washington, DC, for amicus–Chamber of Commerce.

Before TJOFLAT, Chief Judge, COX,
Circuit Judge, and FAY, Senior Circuit
Judge.

TJOFLAT, Chief Judge:

This case involves a steel producer's payment of kickbacks, in the form of illegal
pension payments, to union officials, in violation of the Labor Management Relations
("Taft–Hartley") Act § 302, 29 U.S.C. § 186
(1988), and its failure to notify the employee
pension plan's participants that the plan had
been amended to provide for such payments,
as required by the Employee Retirement
Income Security Act ("ERISA") §§ 101, 102,
104, 29 U.S.C. §§ 1021, 1022, 1024 (1988). A
jury found that the steel producer and the
union officials, by arranging for the pension
payments, violated the Taft–Hartley Act, and
it convicted them under the Act's criminal
enforcement provisions, 29 U.S.C. § 186(d).
In addition, the jury found the steel producer
guilty under ERISA's criminal enforcement
provision, 29 U.S.C. § 1131 (1988), for failing
to notify the pension plan's participants of
the change in their pension plan. Finally,
the jury found that the steel producer, by
making the kickbacks, had engaged in a
scheme to defraud the pension plan's benefi-

ciaries in violation of the mail fraud statute, 18 U.S.C. § 1341 (1988).

The steel producer and the union officials, contending on several grounds that the trial court denied them a fair trial, and, in the case of the union officials, appropriate sentences, ask us to set aside the district court's judgment and order a new trial. We find their contentions meritless, and accordingly affirm their convictions and the union officials' sentences.

## I.

The steel producer in this case is the USX Corporation ("USX"). Headquartered in Pittsburgh, Pennsylvania, USX is a major steel manufacturer; it owns and operates a number of steel mills throughout the United States. The steel workers in these mills are represented by the United Steelworkers of America, International Union ("Union"), which also is headquartered in Pittsburgh, Pennsylvania. A prime, or "basic," collective bargaining agreement, negotiated by USX and the Union's principal officers every three years, governs, among other things, the rates of pay (including pensions) of these workers.[1] "Local" collective bargaining agreements (between USX and the Union's locals), which are negotiated after the basic agreement is reached, cover working conditions such as crew sizes, shift times, and craft assignments, at specific steel mills. These local agreements are negotiated by the Union's district directors and sub-district directors responsible for the Union's district in which the steel mill is located.

The plan that led to the kickbacks in this case evolved during the negotiation of a local agreement between USX and the ten locals at USX's Fairfield Steel Mill ("Fairfield") in Birmingham, Alabama. The negotiations began in September 1983, six months after USX and the Union had reached a basic agreement. At the time, the steel market was depressed and many of USX's mills were idle, including Fairfield. USX was not willing to resume production at these mills unless the locals agreed to a permanent reduction in the labor force, the elimination of "incentive" pay, and the discontinuation of certain restrictive work practices.

Fairfield was located in the Union's District 36.[2] Thermon Phillips and E.B. Rich, the Union officials convicted in this case, were District Director and Sub–District Director, respectively, of District 36; accordingly, the Union assigned them to negotiate the local agreement for the Fairfield steelworkers. William Miller, USX Vice President for Labor Relations, was the USX officer who met with Phillips and Rich and signed, for USX, the local agreement they eventually reached. Miller acted under the direction of J. Bruce Johnston, USX Executive Vice President for Employee Relations. Johnston, in turn, reported to David Roderick, the Chief Executive Officer and Chairman of the Board of Directors of USX.

Phillips and Rich were full time Union employees; the Union paid their salaries and provided their fringe benefits. Years earlier, Phillips and Rich had worked for USX: Phillips from 1948 to 1951 and Rich from 1949 to 1964. At the time they left USX's employment, the basic agreement provided that a worker who wanted to leave USX to become a Union employee, such as a district or sub-district director, could request USX to grant him a one-year "leave of absence." If USX granted the leave, the worker would continue to accrue, for pension purposes, "continuous service" for one year; if requested, USX could extend the leave for one additional year. USX could not extend a worker's leave of absence beyond that, however, because the basic agreement contained a provision limiting a leave of absence to two consecutive years.[3] In order to prevent a break

---

1. The Union negotiates a basic collective bargaining agreement with each major steel producer in the United States, including USX; customarily it negotiates with all of the steel producers at the same time. The basic agreements, however, may differ from one company to another.

2. District 36 covers Alabama, Florida, Louisiana, Mississippi, Puerto Rico, and the Virgin Islands.

3. The leave of absence provision as contained in the 1983 basic agreement read as follows:
   J. *Leaves of Absence for Employees Who Accept Positions with the ... Union* [ ]

in his continuous service, and thus to save his pension, a worker who had left USX to accept Union employment had to return to USX before his leave of absence expired.

Neither Phillips nor Rich returned to USX after leaving its employment in 1951 and 1964, respectively; therefore, at the time they began negotiating the local agreement for the locals at Fairfield in 1983, they had lost whatever right they may have had to receive a USX pension. Nonetheless, Phillips and Rich decided to condition the local agreement they were negotiating, and thus the resumption of production at Fairfield, on USX's willingness to award them enough "continuous service" to entitle them immediately to retire from USX's employment and receive a pension. They also decided to demand similar treatment for six members of Phillips' staff and Bruce Thrasher, the Union's District Director of District 35, all of whom were full-time Union employees and ineligible for a USX pension.[4]

The negotiations over a new local agreement for Fairfield lasted approximately four months and involved several meetings. At the first meeting, Phillips and Rich told Miller that the Union could no longer abide the provision of the basic agreement that limited a leave of absence to two years; the Union wanted the provision amended to authorize the granting of an unlimited leave of absence for those who wished to leave USX to accept Union employment. Miller told Phillips and Rich that USX would not agree to such an amendment, and they did not pursue the matter.

Amending the basic agreement to remove the two-year limitation on leaves of absence would not have entitled Phillips and Rich to receive pensions from USX, because the proposed amendment would apply only to current USX employees, not to former employees who had severed all ties with the company. Whether or not Phillips and Rich were aware of this fact, they subsequently made their intentions clear when, following their second meeting with Miller, Rich took him aside, said "you accommodate us and we'll accommodate you," handed him a piece of paper, and told him to "take care" of the matter. The piece of paper read as follows:

The persons whose names are listed below were active employees of [USX] until they were granted a leave of absence for a specified period of time. They are:

PHILLIPS, Thermon
THRASHER, Bruce
WILLIAMS, Jimmie Lee
GURLEY, Ralph T.
RICH, E.B.
STATUM, Carl
PEARSON, Virgil L.
SHEPHERD, Fred A.
NEWELL, David L.

Those leaves of absence are hereby extended for an indefinite period of time until such person dies or takes pension. Those listed employees will accrue continuous service for pension purposes only. Upon such time as the employee applies for pension, their pension will be calculated as if they had worked during the leave of absence (excluding percentage formula). The type and amount of pension will be governed by the [basic agreement] in effect at the time the employee applies for pension.

(Emphasis added) (social security numbers omitted). If USX agreed, Phillips and Rich (along with the others listed on the paper) would receive pensions with monthly pay-

---

Leaves of absence for the purpose of accepting positions with the ... Union[ ] shall be available to a reasonable number of employees....

Leaves of absence shall be for a period not in excess of one year and may be renewed for a further period of one year.

Continuous service shall not be broken by the leave of absence but will continue to accrue.

Not all steel producers limited leaves of absence to two years in their basic agreements; some granted indefinite leaves of absence to workers who accepted full-time positions with the Union. Thus, if a worker left such a company to work for the Union, he continued indefinitely to accrue "continuous service" for pension purposes.

4. All seven had worked for USX before becoming full-time employees of the Union, but all had been gone from USX for more than two years. Consequently, like Phillips and Rich, none of the seven was eligible for a pension.

ments of hundreds of dollars and present values of over $80,000. Miller sent the piece of paper to Johnston, who, after consulting Roderick, instructed Miller to reject Phillips' and Rich's request.

Following a meeting in October 1983, Phillips and Rich told Miller that there would be no local agreement at Fairfield until USX authorized the pensions. Miller responded that the company knew of no way that the pensions could be paid. Negotiations on other issues continued.

While Miller and Phillips and Rich were negotiating a local agreement for Fairfield, USX also was negotiating local agreements with several of the Union's other district directors. In each case, USX demanded concessions similar to those being demanded from Phillips and Rich. The Union refused to grant the concessions, and by mid-November all negotiations ceased. Nevertheless, Miller continued to communicate with Phillips and Rich. On December 23, 1983, Miller met with Johnston and Roderick to review the situation at Fairfield; he told them that one of the items still "on the table" was the matter of pensions for Phillips and Rich and the seven other Union officials on their list. Johnston instructed Miller to reopen the negotiations, in a last-ditch attempt to reach an agreement before the end of the year.

On the morning of December 24, Miller met with Phillips and Rich in Birmingham, and they reached an agreement and reduced it to writing. Phillips refused to sign the agreement, however, because USX had not agreed to authorize pensions for them and the other Union officials on their list. Miller immediately called Pittsburgh and reported this to Johnston, who had anticipated Phillips' refusal and was ready with an answer. He instructed Miller to tell Phillips and Rich that USX would consider their request for

retroactive leaves of absence, and the "continuous service" it would bring, on the following conditions:

First, because the basic agreement's leave of absence limitation could not be amended by a local agreement, the basic agreement would have to be amended. Moreover, the Union would have to take the initiative and seek the amendment in separate negotiations between its officers in Pittsburgh and USX.

Second, USX would grant retroactive leaves of absence only to those Union officials who had left USX to work for the Union in or before November 1979.[5]

Third, the resulting continuous service would qualify these Union officials for certain types of pensions only.[6]

Fourth, USX would consider pensions only for those who had gone directly from employment with USX to employment with the Union and had continuously serviced a USX steel mill thereafter.

Fifth, USX would consider pensions only for those who had worked for USX steel-producing facilities still in operation.

Sixth, USX would consider pensions only for those who were presently active Union officials.

Seventh, USX would make the pensions effective March 1, 1984.

Finally, Bruce Thrasher would not receive a pension under any circumstances.[7]

As soon as his conversation with Johnston ended, Miller relayed these terms to Phillips and Rich, who in turn asked Miller whether he believed USX would actually grant the pensions. Miller replied that USX would favorably consider the matter. With this assurance, Phillips signed the local agreement (the "Fairfield Agreement").[8] The

---

5. Of the Union officials on Phillips' and Rich's list, the last one to leave USX to work for the Union left in November 1979.

6. The types of pensions available at that time to USX steel workers is not pertinent here, and will receive no further comment.

7. Testimony at trial indicated that Johnston abhorred Thrasher.

8. Soon after the Fairfield Agreement was signed, James Short, USX Vice President of Benefits, who also served as Vice President of the corporation administering USX's pension fund, the United States Steel and Carnegie Pension Fund, Inc., returned from a vacation and learned of the Fairfield Agreement. In particular, he learned that, under the agreement, the labor force at Fairfield had been reduced by 1,300 workers, all of whom had received "early retirement," and that USX was considering granting pensions to

Fairfield Agreement called for a reduction in both the work force at the mill and the incentive pay of its workers, as well as the elimination of most of the restrictive work practices; USX projected a savings in labor costs of over $24 million per year and consequently resumed steel production at Fairfield.[9]

In July 1984, several workers at Fairfield filed grievances against USX calling the interpretation of the Fairfield Agreement into question. Phillips and Rich, as part of their duties as district director and sub-district director, were responsible for determining whether the locals (to which the workers belonged) would prosecute the grievances, and, if the grievances were not resolved, whether to demand arbitration. When Johnston learned of these grievances, and the contract interpretation dispute, he asked Miller whether "we are in jeopardy of losing our momentum with [Phillips and Rich]." Miller replied: "[T]he thing they have their eye on, and the thing that will affect this relationship, will be how we respond [to their request for pensions]." Johnston instructed Miller to tell Phillips and Rich that their pensions would be granted. Miller did so, and the grievances were withdrawn.

At this point, Johnston drafted an amendment to the basic agreement's leave of absence provision for submission to the Union. He did not submit the document to the Union, however, because he had been informed that the amendment, if adopted, might work to the detriment of Phillips and Rich; the Union members at Fairfield might learn of it and conclude that Phillips and Rich had betrayed them by granting several concessions in the Fairfield Agreement in exchange for a pension. In an effort to avoid this perception, Johnston abandoned his plan to have the basic agreement amended; instead, he decided to use USX's Corporate Policy Committee, on which he and Roderick served, as the vehicle for authorizing the pensions Phillips and Rich were demanding.

On October 22, 1984, Johnston submitted to the Committee a two-part proposal, which was adopted the same day.[10] First, Johnston proposed that the Committee amend the USX Personnel Manual, which informed USX's personnel decisions, to allow the Committee to grant leaves of absence to workers who left USX's employment to work for the Union for periods in excess of two years. The Personnel Manual, as then written, stated as follows:

LEAVES OF ABSENCE

2. *Reasons for Granting Leaves of Absence*

a. A leave of absence should be granted ... for such reasons as death or illness in *the employee's* immediate family, for further education of *employees* ... and for such other reasons as may appear proper *to the supervisor authorized to grant such leave.* [The remainder of the paragraph makes it clear that leave under this paragraph applies to current employees.]

b. Leaves of absence will not be authorized to *enable employees to take other jobs....* [This paragraph also applies to current employees.]

c. The formal leave of absence procedure is not followed in the case of *an employee who is sick or otherwise physically disabled.* [This paragraph also applies to current employees.]

d. Leaves of absence for the purpose of accepting positions with the international or local unions shall be available to a reasonable number of *employees* provided adequate notice of intent [on the part of the employee] to apply for leave is given to plant management to enable proper provisions for *filling the job to be vacated* and provided such leave is approved in advance

---

certain Union officials who were ineligible for USX pensions. As he believed it might be unlawful for USX to award such pensions, he asked USX's legal department to look into the matter. The record does not indicate what advice the legal department may have given Short.

9. As USX had failed to get similar concessions from workers at other idle plants where conces-

sions negotiations had taken place, USX permanently closed those plants within a few days.

10. The Committee adopted the proposals perfunctorily, because it considered Johnston, an established labor relations expert, to be the last word on the matter.

by the office of the Vice President—Labor Relations, Pittsburgh. Such leaves of absence shall not break continuous service and shall be for not more than one year and may be renewed for a further period of one year at the discretion of the company.

(Emphasis added.) Johnston proposed that the Personnel Manual be amended by placing the following language after the word "company" at the end of subparagraph d: "except as the Corporate Policy Committee approves the granting of a leave of absence for a longer period of time." The addition of this language did not change the obvious fact that subparagraph d applied to *current employees* who wished to take a leave of absence to work for the Union. The first proposal did not provide pensions for Phillips, Rich, and their colleagues, because they were not current USX employees; rather, it was designed to enhance USX's relationship with the Union by relaxing USX's leave of absence policy to permit indefinite leaves.

Second, Johnston proposed that the Committee grant retroactive leaves of absence to *former employees who* had left USX's employ to work for the Union and, *having exhausted their leaves of absence* (which were limited to a total of two years), *had lost any right they may have had to a USX pension.* Johnston expressed this part of his proposal to the Committee in the following language:

Grant leaves of absence to former employees who meet the conditions specified below:

A leave of absence shall be granted for the period between the date on which *the employee left active employment with United States Steel Corporation* [USX] and the earlier of (i) the date of retirement from [USX], or (ii) the date employment with the [Union] terminates, with the proviso that such leave of absence which is creditable as continuous service shall be used for the purpose of determining eligibility for any type of pension under the 1980 Non–Contributory Pension Rules and any successor thereto other than a 30 year, 60/15 or deferred vested pension and to determine the amount of pension under said rules, except that the pension provided

with respect to such service shall be determined solely on the minimum formula of the rules; and further, that such leave of absence shall be granted only to employees of [USX's] current steel producing operations (e.g., ... Fairfield) who (a) prior to January 1, 1978 left active employment with [USX] in order to accept or continue employment with the Union, (b) from the time of cessation of active employment until September 1, 1984 shall have continued in the active employment of the Union and (c) shall continuously have held position servicing bargaining units at the [USX] division in which he had been employed.

(Emphasis added.) This provision gave Phillips and Rich exactly what they wanted. In fact, unbeknownst to Phillips and Rich, and perhaps even to Johnston, this provision granted continuous service to approximately fifty Union officials who, due to a prolonged break in service, had long ago lost any pension rights they may have had while employed by USX.

A "Basis for Proposal" accompanied Johnston's two-part proposal and read as follows:

It is felt that there is a distinct advantage to be dealing with [Union] representatives who were formerly employed by [USX] concerning potential problems and/or grievances and implementation of the various collective bargaining agreements. Thus, it is in the company's interest to foster and to promote the good will of former employees who were granted leaves of absence to work for the [Union].

Twenty-five days before he submitted his proposal to the Committee, Johnston, anticipating the Committee's adoption of his proposal, signed a PF–116 form—a standard company form that both recommends and authorizes pensions for the person or persons named in the form—for Phillips and Rich and four of the Union officials named on their list. USX did not authorize pensions for three of the Union officials on the list: Thrasher (because Johnston did not like him); Jimmy Williams (because he had died after Phillips and Rich gave Miller the list but before the pension payments began); and David Newell (because he lacked enough years, even counting the new "continuous

service" credit to qualify for a pension). Johnston back-dated the form to January 1, 1984, and indicated on the form that the pensions would be effective March 1, 1984.

A PF–116 normally originates at the steel mill, where the mill manager, the "recommender," signs the form and thereby recommends that the employee be given a pension, and another management official at the mill, the "checker," determines whether the employee is qualified for the pension and signs the form. Then, the form goes to a higher official, in Pittsburgh, who signs the form as the "authorizer." Finally, the form returns to the mill, where the USX employee benefits office certifies to the corporation administering USX's pension fund, the 'United States Steel and Carnegie Pension Fund, Inc., (the "Administrator"), that the employee is entitled to a pension (in a specified amount). In this case, however, Johnston signed the PF–116 as both the recommender and the authorizer. Tom Sterling, the Fairfield manager, signed the form as the checker.[11]

When the PF–116 arrived at the employee benefits office at Fairfield, the employees in the office questioned its propriety and reported the matter to their supervisor, who in turn called USX headquarters in Pittsburgh. After speaking to his superior there, the supervisor instructed the benefits office employees to "keep the matter quiet." The PF–116 never entered the benefits office's records system; the benefits office neverthe-less certified to the Administrator that Phillips, Rich, and the four others named on the form were eligible for pensions.

After the benefits office notified the six Union employees that they were eligible for pensions, five of them (all except Phillips, who was in Florida at the time) came to the office and signed pension applications indicating that they had retired from USX effective March 1, 1984. One of the Union officials signed an application on behalf of Phillips. Although accepting such pensions violated the Union's rules,[12] all six continued to work for the Union.

Of the six Union officials granted pensions, only Rich met the requirements set out in the second part of the Johnston proposal as adopted. Phillips did not qualify because he left USX to work for another union, the CIO. The remainder did not qualify because they, as Union employees, did not service bargaining units at the USX division where they had been employed.

The Administrator finished processing the applications on November 19, 1984, and mailed the initial pension checks on December 1, 1984. From the end of 1984, when the payments began, to the middle of 1988, Rich and Phillips received $48,318 and $55,319, respectively.

Long before the Committee's decision here, USX and the Administrator had entered into a contract whereby USX undertook to perform some of the duties ERISA

---

11. As indicated in the text, *supra*, the second part of Johnston's proposal, if implemented, would render eligible for pensions approximately 50 Union officials who, due to the basic agreement's two-year limit on leaves of absence, were not entitled to receive them. In filling out the PF–116, neither Johnston nor anyone else at USX made any effort to identify these potential pensioners and to place their names on the form.

12. The Union's Manual for Representatives expressly prohibited any Union official from receiving a pension from a company unless the pension was authorized by a collective bargaining agreement. Since USX and the Union had not renegotiated the two-year limitation on leaves of absence in the 1983 basic agreement, the Union policy prohibited the six from accepting USX pensions. The relevant provisions of that policy, which were conditions of Phillips' and Rich's employment with the Union, stated as follows:

4. No responsible trade union official should accept "kickbacks," under-the-table payments, gifts of other than nominal value, or any personal payment of any kind other than regular pay and benefits for work performed as an employee from an employer or business enterprise with which his union bargains collectively.
. . . .

6. *Leaves of Absence and Pension Credits.*
   Representatives shall be entitled to obtain and maintain leave of absence status and/or pension credits from employers only to the extent that such leaves of absence and/or pension credits are *expressly granted or authorized by the terms of a collective bargaining agreement* with the [Union], and the duration of such leaves of absence and/or pension credits shall be in strict conformity to the limitations provided in such collective bargaining agreement.
(Emphasis added.)

imposed on the Administrator. ERISA requires the administrator of a pension plan to notify the Department of Labor and all of the plan's participants of any material changes to the pension plan. The Corporate Policy Committee's decision to authorize pensions for Phillips and Rich and the approximately fifty other similarly situated Union officials constituted a material change in the pension plan; thus, such notification was required. Among the duties that USX assumed was the Administrator's duty to notify the Department of Labor and the pension plan's participants of the Committee's creation of a new class of beneficiaries (by adopting the second part of Johnston's proposal). USX, however, failed to notify the Department of Labor or the pension plan's participants that a new class of pension beneficiaries had been created.[13]

On November 15, 1989, a federal grand jury returned a sixteen-count indictment against USX, Phillips, and Rich. Count one charged all of the defendants with conspiring to make and receive payments prohibited by the Taft–Hartley Act, 29 U.S.C. § 186(a)(4) and (b). Counts two and three charged Rich and Phillips, respectively, with receiving payments in violation of section 186(b)(1). Counts four and five charged USX with making payments to Phillips and Rich respectively, in violation of section 186(a)(1). Counts six through fifteen charged USX, Phillips, and Rich with mail fraud in violation of 18 U.S.C. § 1341. Count sixteen charged USX with failing to notify the pension plan participants of the modification of their pension plan in violation of ERISA, 29 U.S.C. § 1131.

The case went to trial on March 5, 1990. At the conclusion of the government's case-in-chief on May 21, 1990, the district court granted the government's motion to dismiss the mail fraud charges against Phillips. The case went to the jury on the charges that remained on July 1, 1990. The jury acquitted Rich on the mail fraud counts but returned verdicts of guilty on all remaining counts against all three defendants. They now appeal their convictions; Phillips and Rich also appeal their sentences.

Of the claims of error raised on appeal, only three merit discussion. The first claim, addressed in Part II, is that the court's jury instruction on an exception to the prohibitions of the Taft–Hartley Act, 29 U.S.C. § 186(c)(1), precluded a legitimate defense argument, that a payment by an employer to his former employee is not prohibited by the Taft–Hartley Act so long as the payment was made "by reason of" the employee's service, and was not a bribe. The two remaining claims, addressed in Part III, are: (a) that the district court's charge to the jury on the criminal enforcement provision of the Taft–Hartley Act, 29 U.S.C. § 186(d)(2), allowed the jury to convict on Counts two through five without finding the requisite level of criminal intent; and (b) that the court's jury instruction on the criminal enforcement provision of ERISA, 29 U.S.C. § 1131, similarly allowed the jury to convict on Count sixteen without finding the appropriate level of criminal intent.[14]

13. The Corporate Policy Committee similarly failed to notify any USX officials, including those responsible for benefits and labor relations in the various field offices, of the creation of the new class of pension beneficiaries.

14. Appellants' other claims of error are patently meritless and do not warrant further discussion. These claims are: (1) the trial court erred in altering the indictment for counts two through five by deleting certain language, "intent to influence," as surplusage; (2) the trial court erroneously struck evidence concerning the practices of other steel producers in granting benefits to employees engaging in union activities and improperly instructed the jury to disregard such practices, thereby impeding appellants from contesting the mens rea element of the count one conspiracy charge; (3) the trial court erred in admitting evidence, including legal documents and related rulings from prior cases, concerning appellants' knowledge of illegality; (4) the trial court improperly refused to consolidate the trial of the instant case with the trial of the government's case against J. Bruce Johnston, thereby depriving appellants of Johnston's testimony (Johnston claimed Fifth Amendment immunity and did not testify at appellants' trial); (5) the trial court erroneously removed an essential element of the Taft–Hartley Act offenses from the jury by instructing the jury that USX's steelworkers were engaged in an industry affecting commerce; (6) the trial judge's overall conduct in the presence of the jury, in which he allegedly displayed a bias against appellants, deprived them of a fair trial; (7) the trial court erroneously excluded evidence, on the ground that it was irrelevant, that the government had approved of leave of absence provisions similar to the USX–Union basic agreement in effect when USX authorized the pensions

## II.

We first consider appellants' claim that the district court's charge to the jury regarding an exception to the Taft–Hartley Act was erroneous because it precluded a legitimate defense argument.[15]

The Taft–Hartley Act, 29 U.S.C. §§ 141–187, is, in part, a conflict-of-interest statute designed to eliminate practices that have the potential for corrupting the labor movement. *United States v. Pecora*, 798 F.2d 614, 622 (3d Cir.1986). To achieve this goal, Congress prohibited *all* payments from employers to representatives of their employees and union officials. Section 186(a) prohibits employers, in industries affecting interstate commerce, from paying anything of value to representatives of their employees or union officials.[16] Section 186(b) prohibits representatives and union officials from receiving such payments.[17]

Appellants' argument focuses on the district court's instruction to the jury concerning section 186(c)(1), which contains an exception to the broad prohibitions of sections 186(a) and (b). Section 186(c)(1) provides that sections 186(a) and (b) shall not be applicable "in respect to any money ... payable by an employer to ... any officer or employee of a labor organization, who is also an employee or former employee of such employer, *as compensation for, or by reason of,* his service as an employee of such employer."* (Emphasis added.) The district court instructed the jury that the exception applies

> only to payments by an employer to former employees *for past services actually rendered* by those former employees *while* they were employees of the employer company.... [T]he Court further instructs you that whether payments in the form of USX Corporation pension payments and money paid thereby were made by or for USX Corporation to an individual defendant as compensation for or by reason of that defendant's past service as an employee of USX Corporation is a factual issue for you to decide from the evidence in the case.

(Emphasis added.)

Appellants contend that the pension payments USX made to Phillips and Rich qualify for an exception under section 186(c)(1). Although appellants concede that the pension payments were not given "as compensation for" the past service of Phillips and Rich as USX employees, they argue that section 186(c)(1) also excepts payments given "by reason of" service as former employees, which, unlike compensation, need not be for past services actually rendered by those former employees while they were employees of the employer company. The district court,

---

here in issue; (8) the trial judge erred in refusing to instruct the jury on appellants' good faith defense to the mail fraud charges; (9) the evidence was insufficient to establish a case of mail fraud against USX; (10) the evidence was insufficient to establish USX's noncompliance with ERISA; (11) the trial court admitted documents that had not been adequately identified; (12) the district court erred by quashing Phillips' and Rich's subpoenas for then Attorney General Richard Thornburgh and Fred Reebels, a labor mediator, and thereby deprived them of evidence that the government had approved leave of absence provisions similar to the provision contained in the USX–Union basic agreement in effect when the pensions here at issue were awarded; and (13) the trial court misapplied the United States Sentencing Commission Guidelines in fashioning Phillips' and Rich's sentences.

15. Because a challenge to a jury instruction presents a question of law, our review is *de novo*. See *United States v. Chandler*, 996 F.2d 1073, 1085 (11th Cir.1993).

16. The pertinent part of 29 U.S.C. § 186(a) provides as follows:

> It shall be unlawful for any employer ... to pay, lend, or deliver ... any money or other thing of value—
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
> ....
> (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

17. The pertinent part of 29 U.S.C. § 186(b) provides as follows:

> (1) It shall be unlawful for any person to request, demand, receive, or accept ... any payment, loan, or delivery of any money or other thing of value prohibited by [section 186(a)].

they contend, ignored the "by reason of" language in section 186(c)(1) and thereby precluded this legitimate defense argument.[18]

■ We disagree with appellants' interpretation of the trial court's jury instruction; we do not read it as ignoring the "by reason of" portion of section 186(c)(1). Congress, in using the alternative formulations of "as compensation for" and "by reason of" in that provision, intended to remove from the statute's prohibitions two general categories of payments to employees: (1) wages, i.e., sums paid to an employee specifically "as compensation for" work performed; and (2) payments not made specifically for work performed that are occasioned "by reason of" the fact that the employee has performed (or will perform, in the case of a current employee) work for the employer. *BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union,* 791 F.2d 1046, 1049 (2d Cir.1986). The latter category includes employee "fringe" benefits, such as vacation pay, sick pay, and pension benefits. *Id.* Whether "as compensation for" or "by reason of" service to an employer, all payments from an employer to a union official must relate to services actually rendered by the employee for the section 186(c)(1) exception to apply.

■ Since it was undisputed that both Phillips and Rich had severed their employment relationship with USX before USX authorized their pensions, the district court accurately observed that the pension payments in this case must have been "for *past* services actually rendered by those *former* employees *while they were employees* " to fall within the section 186(c)(1) exception. (Emphasis added.) Once an employee has severed the employment relationship with his employer, he is described accurately as a *former* employee. Because section 186(c)(1) only excepts payments given "as compensation for" or "by reason of" an employee's "service as an employee," a payment given to a *former* employee must be for services he rendered

*while he was an employee* to qualify for the exception. A payment given to a *former* employee for present or future services, which by definition could not be "as compensation for" or "by reason of" his "service as an employee," would violate the plain language of the exception and would be exactly the type of conflict-tainted payment that Congress designed the Taft–Hartley Act to prevent.

Further, the trial court's jury instruction, and our interpretation of it, is entirely consistent with decisions of other courts interpreting section 186(c)(1). An employee's "right" to receive a "benefit" while on leave with the union has been upheld when it vested *before* the employee began the leave of absence to work for the union as well as *before* the employer delivered the benefits. Thus, the employer granted the benefits to the employee *for past services actually rendered* by the former employee *while* he was an employee of the employer, since the employee had earned the full right to receive the benefits before going on a leave of absence to work for the union. *See, e.g., NLRB v. BASF Wyandotte Corp.,* 798 F.2d 849 (5th Cir.1986) (finding that a collective bargaining agreement granting employees certain benefits under the plan while they were on "union leaves" of absence from the employer fell within the § 186(c)(1) exception); *BASF Wyandotte Corp.,* 791 F.2d 1046 (same for no-docking provisions). In contrast, the section 186(c)(1) exception does not apply when a company pays a union official who was a former employee, but who did not have a right to such payment before he severed his employment relationship with the company. In *Toth v. USX Corp.,* 883 F.2d 1297 (7th Cir.), *cert. denied,* 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989), the Seventh Circuit, in an action against USX for denying pensions to Union officials who were eligible under the second part of the Johnston proposal as adopted, considered pension pay-

---

**18.** Appellants contend that if we place our imprimatur on the district court's jury instruction, we will, in effect, render unlawful *per se* many legitimate fringe benefits, including no-docking provisions and the accrual of benefits (such as pension credits and seniority) during the period that an employee is on leave as a union official. "No-

docking" provisions allow union officers who are full-time company employees to take time off from work, with pay, to conduct union business. This contention greatly overstates the reach of the district court's instruction, so we need not address it.

ments identical to those at issue in this case and found that they were illegal because they did not fall into any of the exceptions listed in section 186(c). The court stated that USX's policy

> cannot qualify as "compensation for or by reason of" former employment because ... USX's leave policy was not a part of the bargained-for collective bargaining agreement. It was a unilateral change—under [USX's] own allegations, a bribe. That the change here was at least conducive to or suggestive of bribery ... should indicate why it is not suitable for exemption from the general section [186] prohibition on gifts or loans from employers. Allowing more former employees to "get in" on the bribe would hardly further the purposes of section [186].

*Id.* at 1305 (footnote omitted). We agree with the Seventh Circuit that payments akin to those in this case do not fall within the section 186(c)(1) exception. When an employee's right to a benefit has fully vested before the leave of absence begins, there is no danger of corruption when the employer delivers the benefit after that employee leaves the company to work for the union; the employer is merely satisfying a preexisting obligation that is unaffected by the employee's current status with the union. Where, however, as in the case before us, company officials ignore the company's collective bargaining agreement with a union and secretly grant retroactive leaves of absence, and thus pension benefits, to a small number of the union's officials (and those officials ignore union policy and accept the benefits), all of the evils that prompted Congress to pass the Taft–Hartley Act are present.

We hold that all payments given by an employer to a former employee must be for past service actually rendered by the former employee while employed by the employer to qualify for an exception under section 186(c)(1). Accordingly, because the jury charge in this case accurately stated the law, and because the question of whether appel-

lants' actions conformed with the requirements of section 186 was properly left to the jury, we conclude that the district court committed no error and thus reject appellants' first claim.

### III.

We next address appellants' claim that the district court misinterpreted the term "willfully" as used both in 29 U.S.C. § 186(d)(2) and in 29 U.S.C. § 1131, the applicable criminal enforcement provisions of the Taft–Hartley Act and ERISA, respectively. Appellants argue that the district court's misinterpretations resulted in jury instructions that set forth a prejudicially low standard of criminal intent for the charges under the Taft–Hartley Act and ERISA.[19]

As the Supreme Court has observed, the term "willfully" has " 'many meanings,' and 'its construction [is] often ... influenced by its context.' " *Ratzlaf v. United States,* —— U.S. ——, ——, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994) (quoting *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943)). *See also United States v. Murdock,* 290 U.S. 389, 395, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) ("Aid in arriving at the meaning of the word 'willfully' may be afforded by the context in which it is used."). The interpretation of willfully "turns on [each statute's] own peculiar facts." *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945).

For instance, in some contexts, courts have interpreted "willfully" as requiring a finding of general intent, meaning the intent to engage in the prohibited conduct; that is, acting voluntarily, knowingly, and intentionally, and not accidently or mistakenly. *See, e.g., Browder v. United States,* 312 U.S. 335, 341, 61 S.Ct. 599, 603, 85 L.Ed. 862 (1941) (interpreting 22 U.S.C. § 220, which provides punishment for a person who knowingly and willfully uses any passport secured by the making of a false statement). Thus, a defendant need not intend to violate the law to commit a general intent crime, but he

---

19. Because these contentions present solely a question of law, our review is *de novo. See*

*Chandler,* 996 F.2d at 1085.

must actually intend to do the act that the law proscribes.[20] In other circumstances, courts have construed the term "willfully" to require a finding of specific intent, meaning the intent to violate the law; that is, acting with a "bad purpose" to disobey or disregard the law. *See, e.g., Cheek v. United States,* 498 U.S. 192, 200, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991) (interpreting the Internal Revenue Code and noting ·that the specific intent interpretation of "willfully" in the federal tax statutes is an "exception to the traditional rule" that "willfully" requires a finding of only general intent, applied "largely due to the complexity of the tax laws").

This appeal therefore requires us to make the same determination concerning each of the criminal enforcement provisions under which the appellants were convicted: whether the use of the term "willfully" in each statute requires a finding of general or specific intent as we have defined those terms. While our inquiry is the same for the criminal enforcement provisions of both the Taft–Hartley Act, 29 U.S.C. § 186(d)(2), and ERISA, 29 U.S.C. § 1131, we must remain "mindful of the complex of provisions in which they are embedded." *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 659.

### A.

█ We first address appellants' claim that the district court's misinterpretation of 29 U.S.C. § 186(d)(2), the applicable criminal enforcement provision of the Taft–Hartley Act, resulted in an erroneous jury charge that allowed the jury to convict on Counts two through five without finding the appropriate level of intent. This claim raises an issue of first impression in this circuit.

Appellants' argument centers on the trial judge's interpretation of the term "willfully" in section 186(d)(2), which provides that "any person who willfully violates [section 186] shall, upon conviction thereof, be guilty of a felony and be subject to a fine of not more than $15,000 . . . ." The district court instructed the jury that:

> [T]he Government is not required to prove that the pension payments were made by or for USX Corporation or received by the individual defendants with an evil or bad purpose or with the intent to violate the law or with knowledge that the law would be or was violated. Neither is it necessary . . . for the Government to prove that Thermon Phillips and E.B. Rich intended to be influenced by their acceptance and receipt of such pension payments or that they or either of them were in fact influenced by such payments. However, the Government must prove that the defendants acted "willfully" . . . .
>
> The word "willfully" means that a person or entity charged as a defendant knowingly and intentionally committed acts which constitute the offense charged and that such acts were not committed accidently or by some mistake. For example, if USX Corporation caused a pension check to be sent to one of the individual defendants by accident or mistake, such as a computer error, such USX Corporation act would not be intentional and thus would not be willful. On the other hand, if USX Corporation intended for such a pension check to be sent and knowingly caused it to be sent then that act would be willful.
>
> The word "knowingly" imports only a knowledge of the existence of the facts in question. The word does not require, as a part of its meaning, that there be any knowledge or awareness that such act or omission is prohibited by law . . . .
>
> [T]he government [is not required] in this case to prove a specific intent by the defendant to violate this Taft–Hartley statute or a particular part thereof in order to establish the federal criminal offense charged.

Appellants maintain that section 186(d)(2) requires a finding of specific, and not merely general, intent, and that the district court therefore erred by not giving the Eleventh Circuit pattern jury instruction on "willfully," which defines the term as meaning "that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law." Eleventh

---

**20.** The term "law" in this context means the law as a whole, not any specific statute.

Circuit District Judges Ass'n, *Pattern Jury Instructions: Criminal Cases*, Basic Instruction No. 9.1 at 22 (1985). The term "bad purpose" does not mean evil motive, but merely the intent to act in knowing or reckless disregard of the law. *See United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23–24, 50 L.Ed.2d 12 (1976). Thus, according to appellants, the district court should have instructed the jury that the Government was required to prove that the defendants acted with specific intent, which means, at a minimum, that they acted with reckless disregard of the Act's prohibitions.

Initially, we note that appellants' reading of the statute is the minority view; the Second, Third, Sixth, and Ninth Circuits all have held that the term "willfully" as used in section 186(d) requires proof only of general intent.[21] Although appellants recognize that other circuits have interpreted section 186(d) as requiring a finding of only general intent, they maintain that these decisions are erroneous and based on a faulty reading of dictum in *United States v. Ryan*, where the Supreme Court stated that "[a]s [section 186] reads, it appears to be a criminal provision,

*malum prohibitum*, which outlaws all payments, with stated exceptions, between employer and representative." 350 U.S. 299, 305, 76 S.Ct. 400, 404, 100 L.Ed. 335 (1956). From this statement, appellants contend, the Second and Third Circuits erroneously concluded that knowledge of illegality is not an element of a criminal offense under section 186.[22] They urge this court to follow the specific intent interpretation approved by the Seventh Circuit. *See, e.g., United States v. Papia*, 910 F.2d 1357, 1362 (7th Cir.1990).[23]

Whether these decisions misread dictum in *Ryan* is not relevant, however, because there are two independent reasons, which these decisions do not discuss, why we should reject appellants' contention that section 186(d)(2) requires a finding of specific intent. First, Congress designed the language and structure of section 186 around a general intent interpretation of "willful" in section 186(d). Second, Congress, recognizing the majority interpretation of "willful" in section 186(d) as requiring general intent, left the mens rea component unchanged when it created section 186(d)(2) in 1984. We discuss each reason in turn.

---

**21.** *See, e.g., United States v. Cody*, 722 F.2d 1052, 1059 (2d Cir.) (requiring proof only that defendant "received and knew that he was receiving a benefit of value"), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1983); *United States v. Pecora*, 484 F.2d 1289, 1294 (3d Cir. 1973) (requiring knowledge only "(1) that there were 'payments'; and (2) that the payments came from employers who employed workers represented by [defendant]"); *United States v. Carter*, 311 F.2d 934, 943 (6th Cir.) (quoting Hand, J., with approval: "the word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law."), *cert. denied*, 373 U.S. 915, 83 S.Ct. 1301, 10 L.Ed.2d 415 (1963); *United States v. Bloch*, 696 F.2d 1213, 1216 (9th Cir.1982) ("A 'willful' violation of 29 U.S.C. § 186 requires only that the defendant act with knowledge that the payments are from a person acting in the interest of an employer.... [K]nowledge of the statutory prohibition itself is not necessary."); *see also United States v. Silva*, 517 F.Supp. 727, 735 (D.R.I.1980) ("The word 'willfully' means that the person knowingly and intentionally committed the acts which constituted the offenses charged.... The word does not require, as a part of its meaning, that there be any knowledge or awareness that such act or omission is in fact

prohibited by law."), *aff'd*, 644 F.2d 68 (1st Cir. 1981).

**22.** *See United States v. Ricciardi*, 357 F.2d 91, 100 (2d Cir.1966); *United States v. Lanni*, 466 F.2d 1102, 1110 (3rd Cir.1972); *see also Carter*, 311 F.2d at 943–44 (citing *United States v. Ryan*, 232 F.2d 481 (2d Cir.1956) (on remand from the Supreme Court)); *Bloch*, 696 F.2d at 1216 (citing *Carter*).

**23.** In *Papia*, the court rejected the argument that the appellant was entitled to a jury instruction that "[a] person who intentionally performs an act, aware that the law prohibits the act, or in reckless disregard of the law's prohibitions, has intentionally done an act forbidden by law," because the court saw little difference between the requested instruction and the given instruction, "[a]n act is done 'willfully' if done voluntarily and intentionally, and with the intent to do something the law forbids; that is to say, with a purpose either to disobey or disregard the law." *Id.* at 1362. The court, however, did not reach the question of whether the Act requires an instruction that a person must act "with a purpose either to disobey or disregard the law" to be convicted, because the trial court had given a specific intent instruction. Thus, we do not read *Papia* as involving the same issue involved in this case.

### 1.

After briefly reviewing the statutory scheme of section 186, we explain why the language of section 186 and the dual structures of both section 186(a) and section 186(d) compel the conclusion that Congress intended "willfully" in section 186(d) to require a finding of only general intent.

### a.

Section 186 is divided into four parts: section 186(a) prohibits employers, in industries affecting interstate commerce, from paying anything of value to "representatives" of their employees or union officials; section 186(b) prohibits representatives and union officials from receiving such payments; section 186(c) provides nine exceptions to the prohibitions of sections 186(a) and (b); and section 186(d) contains the criminal enforcement provisions of the Taft–Hartley Act.

Section 186(c) contains two types of exceptions. The first three exceptions, sections 186(c)(1)–(3), describe payments that do not have the potential for corrupting the labor movement. Section 186(c)(2), for example, contains an exception for payments "in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress." The last six exceptions, sections 186(c)(4)–(9), describe payments that could corrupt the labor movement unless certain protective requirements are met. These sections describe the type of payment that is eligible for the exception and then outline the technical requirements that must be met before a payment will qualify for the exception. For example, section 186(c)(4) provides that sections 186(a) and (b) shall not be applicable with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.

Thus, section 186 envisions three general classes of payments: payments that are always illegal (for which Congress did not provide an exception in section 186(c)); payments that are always legal (for which Congress provided the exceptions in sections 186(c)(1)–(3)); and payments that may be legal if they satisfy certain technical requirements (for which Congress provided the exceptions in sections 186(c)(4)–(9)).

Before Congress amended section 186 in 1984, the criminal enforcement provision in section 186(d) provided that "[a]ny person who willfully violates any of the provisions of ... section [186] shall ... be guilty of a misdemeanor." Congress, recognizing that "[f]ederal prohibitions and penalties designed to protect the legitimacy of labor relations have ... proved to be inadequate," strengthened the Taft–Hartley Act in 1984, making a payment or receipt of over $1,000 punishable by up to five years imprisonment. Senate Comm. on the Judiciary, Comprehensive Crime Control Act of 1984, S.Rep. No. 225, 98th Cong., 2d Sess. 297 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3477.

Congress acknowledged, however, that the payments described in sections 186(c)(4)–(9) do not generally involve payoffs, bribes, or conflicts of interest, and that one could violate the Act merely by failing to satisfy a technical requirement. *Id.* at 297, *reprinted in* 1984 U.S.C.C.A.N. at 3477. To avoid the imposition of heightened penalties for "inadvertent" conduct, Congress divided the criminal enforcement provision in section 186(d) into two parts.[24] The first part, section

---

**24.** As amended, section 186(d) provides as follows:

(d) Penalty for violations

   (1) Any person who participates in a ... payment ... [which] does not satisfy all of the applicable requirements of subsections (c)(4) through (c)(9) of this section, and willfully and with intent to benefit himself or to benefit other persons he knows are not permitted to receive a payment ... shall ... be guilty of a felony [if value of payment exceeds $1,000]....

   (2) Except for violations involving transactions covered by subsection (d)(1) of this section, any person who willfully violates this section ... shall ... be guilty of a felony [if value of payment exceeds $1,000]....

29 U.S.C. § 186(d) (1988).

186(d)(1), applies only to violations caused by payments that could have fallen within the exceptions provided by sections 186(c)(4)–(9) had the payments met their requirements. Section 186(d)(1) requires proof that a person participated in a payment "willfully *and with intent to benefit himself or to benefit other persons he knows are not permitted to receive a payment....*" (Emphasis added.) The second part, section 186(d)(2), applies to all violations not covered by section 186(d)(1), including the violations in this case. The mens rea component of section 186(d)(2) remains unchanged from the former section 186(d); it requires proof only that a person "willfully violate[d] this section."

### b.

The only difference between sections 186(d)(1) and (d)(2) is the additional "intent" requirement of section 186(d)(1). Section 186(d)(1) now requires that the government establish more than general intent, namely that the defendant participated in a payment "willfully and with intent to benefit himself or to benefit other persons he knows are not permitted to receive ... a thing of value." Congress had to have intended the term "willfully" as used in both sections 186(d)(1) and (d)(2) to require a finding of general intent; otherwise, the "intent to benefit" language in section 186(d)(1) would be superfluous, because a person who had the specific intent to violate the Taft–Hartley Act would also necessarily intend to benefit himself or to influence a union official. Under appellants' interpretation, the additional intent requirement of section 186(d)(1) would serve

only to except payments made with the specific intent to violate the law, but without the intent to benefit himself or to influence the recipient. We seriously question whether this scenario could actually occur, let alone whether Congress intended such an absurd statutory scheme. It is well established that "[j]udges should hesitate ... to treat statutory terms [as mere surplusage] in any setting, and resistance should be heightened when the words describe an element of a criminal offense." *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 659. Moreover, had "willfully" in section 186(d) required a finding of specific intent before the 1984 amendment, Congress would not have needed to create section 186(d)(1) to avoid the imposition of heightened penalties for inadvertent conduct.

### c.

Appellants' interpretation of "willfully" also renders other aspects of the statutory scheme of the Taft–Hartley Act meaningless. In sections 186(a)(1) and (a)(2), Congress prohibited *any* payment by an employer to an employee representative.[25] In sections 186(a)(3) and (a)(4), Congress prohibited *any* payment by an employer to a *larger class* of individuals and groups, including union officials, union employees, and individuals or groups who could influence employee representatives, if the payment was made with the "intent to influence" the recipient.[26]

Given that the "intent to influence" language is in sections 186(a)(3)–(4) and not in the section 186(d)(2) criminal enforcement provision, Congress must have intended sections 186(a)(1)–(2) to prohibit payments to

**25.** The pertinent part of 29 U.S.C. §§ 186(a)(1)–(2) provides as follows:

It shall be unlawful for any employer ... to pay ... any money or other thing of value—
 (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
 (2) to any labor organization, or any officer or employee thereof, which represents ... any of the employees of such employer who are employed in an industry affecting commerce....

**26.** The pertinent part of 29 U.S.C. §§ 186(a)(3)–(4) provides as follows:

It shall be unlawful for any employer ... to pay ... any money or other thing of value—
 (3) to any employee or group or committee of employees of such employer ... in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly *to influence* any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
 (4) to any officer or employee of a labor organization ... *with the intent to influence* him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
(Emphasis added.)

representatives even if they were made without any intent to influence. Any other interpretation would render the requirement of "an intent to influence" in sections 186(a)(3) and (a)(4) mere surplusage. Under appellants' interpretation of "willfully" in section 186(d), sections 186(a)(1) and (a)(2) would serve only to prohibit payments made to employee representatives without any intent to influence but with the specific intent to violate the law. We cannot agree with such a nonsensical result; the statutory scheme is coherent and rational when "willfully" is interpreted as requiring only general intent.

### d.

For these reasons, appellants' interpretation of the term "willfully" in section 186(d) is illogical and inconsistent with the language and structure of the Taft–Hartley Act. The double enforcement provision in section 186(d) and the dual structure of prohibited payments in section 186(a) suggest that Congress intended the term "willfully" to require proof only that the payment was made knowingly and intentionally, not accidentally or by some mistake.

### 2.

The second reason for rejecting appellants' interpretation of the term "willfully" in section 186(d) is based not upon what Congress expressly provided in the language and structure of section 186, but upon what Congress left unchanged when it amended the section 186(d) criminal enforcement provision in 1984. When Congress amended section 186(d) in 1984, it made no attempt to change the clear majority rule that "willfully" required a finding of only general intent.[27] Because Congress left the willfulness requirement of former section 186(d) unchanged when it created section 186(d)(2) in 1984, we can only assume that Congress intended "willfully" to require a finding of only general intent. Congress is presumed to be knowledgeable about existing case law pertinent to any legislation it enacts, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990), and about the basic rules of statutory construction, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 111 S.Ct. 888, 898, 112 L.Ed.2d 1005 (1991).

Congress, had it intended "willfully" to require specific intent, would have taken steps to ensure that the statute overruled those cases holding otherwise. Conspicuously, signs of congressional intent to change the majority rule are absent from both the face of the statute and the legislative history. When considered with the language and structure of the statute, the absence of signs of congressional intent to overrule the prior cases bolsters our conclusion that the term

---

**27.** By 1984, the Second, Third, Sixth, and Ninth Circuits had interpreted the term "willfully" in section 186(d) as requiring only proof of general intent. *See, e.g., Cody,* 722 F.2d at 1059; *Pecora,* 484 F.2d at 1294; *Carter,* 311 F.2d at 943; *Bloch,* 696 F.2d at 1216; *see also Silva,* 517 F.Supp. at 735. The only circuit holding to the contrary was the Seventh Circuit. The Seventh Circuit cases, however, were contradictory and internally inconsistent. In *United States v. Inciso,* 292 F.2d 374, 380 (7th Cir.), *cert. denied,* 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961), the court held that section 186(d) "contemplates proof of an awareness of the restrictions of that section or a reckless disregard for that section." In *United States v. Keegan,* 331 F.2d 257, 261–62 (7th Cir.), *cert. denied,* 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964), however, the court held that a jury instruction requiring proof of only the first element of a two-part definition of reckless conduct, "knowledge of the material facts surrounding the proscribed conduct," without the second element, "whether a reasonable man would be aware that such conduct would likely be illegal," was sufficient. *See also United States*

*v. Kaye,* 556 F.2d 855, 863–64 (7th Cir.) (following *Keegan* ), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). A jury instruction consisting of only the first element of reckless conduct, knowledge of the material facts surrounding the proscribed conduct, is the practical equivalent of a general intent jury instruction.

The Tenth Circuit discussed section 186(d) in *Korholz v. United States,* 269 F.2d 897, 903 (10th Cir.), *cert. denied,* 361 U.S. 929, 80 S.Ct. 367, 4 L.Ed.2d 352 (1959), and upheld a jury instruction that a person must be "either conscious of the fact that what he is doing constitutes a violation of the law or unless he wholly disregards the law and pursues a course without making any reasonable effort to determine whether the plan he is following would constitute a violation of the law or not." The court's discussion is too cryptic, however, to draw a conclusion about whether a general intent instruction would have been upheld. Consequently, the Tenth Circuit cannot be said to have clearly ruled on this issue at the time of the 1984 amendment of section 186(d).

"willfully" requires a finding of general intent.

### 3.

In sum, the language of section 186, the dual structures of sections 186(a) and 186(d), the case law interpreting 186(d) at the time Congress amended section 186, and the legislative history of the Taft–Hartley Act support the conclusion that Congress intended section 186(d)(2) to require a finding of only general intent. Despite these indications that Congress intended section 186(d)(2) to require a finding of only general intent, appellants contend that section 186(d)(2) requires a finding of specific intent, because the Taft–Hartley Act, like the Internal Revenue Code, is a complex statute that has been subject to widely disparate interpretations. They argue that Congress, particularly in a statute like the Taft–Hartley Act in which the boundaries of permissible action are ambiguous, intends the term "willfully" to create felony culpability only for those persons who know that their actions violate the law, or who recklessly disregard whether they have the right to act in the manner they have chosen.

The facts of this case illustrate perfectly why Congress intended the term "willfully" in section 186(d)(2) to require a finding of only general intent to sustain a conviction. Neither USX nor Phillips and Rich needed to consult section 186 to determine that their actions, in paying and receiving the pensions, were illegal; they knew these acts were illegal. Section 186 codifies a basic moral tenet: an employer should not bribe a representative of his employees (or make any payments that could be perceived as a bribe), and such a representative should not accept a bribe (or any payment that could be perceived as a bribe). Appellants, of course, knew this. In enacting section 186, Congress simply prohibited people, such as Phillips and Rich and the USX officials involved in this case, from committing acts that they should know are inherently wrong—whether or not they were aware of the text of section 186 is of no moment. Accordingly, the district court's jury charge accurately described the mens rea requirement of section 186(d)(2) of the Taft–Hartley Act.

### B.

■ We next consider USX's claim that the district court's charge to the jury with respect to the ERISA violation alleged in Count 16 set forth a prejudicially low standard of criminal intent. Again, the solution to the problem focuses on the proper interpretation of the term "willfully," and on whether the ERISA criminal enforcement provision requires a finding of general or specific intent. At issue is section 1131 of ERISA,[28] which makes it a criminal misdemeanor willfully to violate Part 1 of ERISA, which contains the reporting and disclosure requirements governing those who control and administer employee benefit plans. Part 1 of ERISA requires the administrator[29] of a pension plan to notify the Department of Labor and the plan's participants and beneficiaries of any material modifications in the terms of the pension plan, such as the creation of a new class of pension beneficiaries. 29 U.S.C. § 1021 (1988).[30]

---

28. The pertinent part of 29 U.S.C. § 1131 (1988) provides as follows:

> Any person who willfully violates any provision of part 1 of [ERISA], ... shall upon conviction be fined not more than $5,000 or imprisoned not more than one year, or both; except that in the case of such violation by a person not an individual, the fine imposed upon such person shall be a fine not exceeding $100,000.

29. USX, by a contract with the Administrator of the USX pension fund, had assumed the duty ERISA imposes to report and disclose material modifications of the pension plan; consequently, USX was the "administrator" for the purpose of ERISA's reporting and disclosure requirements.

30. The relevant provision in 29 U.S.C. § 1021 (1988), which provides in pertinent part:

> The administrator of each employee benefit plan shall cause to be furnished in accordance with section 1024(b) of this title to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan—
>
> (1) a summary plan description described in section 1022(a)(1) of this title; and
>
> (2) the information described in sections 1024(b)(3) and 1025(a) and (c) of this title.

The district court charged the jury that a defendant who "knowingly and intentionally committed acts which [violated Part 1 of ERISA] and ... were not committed accidentally or by some mistake" was guilty of violating Part 1 of ERISA. USX argues that section 1131 prohibits violations of Part 1 of ERISA caused by "act[s] committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose to disobey or disregard the law." In support of this position, USX argues simply that ERISA is a complex statute; therefore, Congress intended "willfully" to require a finding of specific intent. USX, however, does not point to anything within the statute itself to support its argument. After examining the language and structure of ERISA, we cannot agree with USX's interpretation.

As explained by Congress, Part 1 of ERISA is designed: (1) to require the disclosure of significant information about employee benefit plans and all transactions engaged in by those who control the plans; (2) to provide specific data to plan participants and beneficiaries about the rights and benefits to which they are entitled and the circumstances that may result in a loss of those rights and benefits; and (3) to set forth the responsibilities and proscriptions applicable to persons occupying a fiduciary relationship to employee benefit plans. *See* House Education and Labor Committee, Employee Retirement Income Security Act of 1974, H.Rep. No. 533, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4648–49. To achieve the third goal, Congress codified a "'prudent man' standard for evaluating the conduct of all fiduciaries." *Id.* at 4649. In doing so, Congress placed a

> twofold duty on every fiduciary: to act in his relationship to the plan's fund as a prudent man in a similar situation and under like conditions would act, and to act consistently with the principles of administering the trust for the exclusive purposes previously enumerated, and in accordance with the documents and instruments governing the fund unless they are inconsis-

> tent with the fiduciary principles of the section.

*Id.* at 4651.

Consistent with the codification of a prudent man standard, Congress, in 29 U.S.C. § 1028 (1988), provided a detailed set of exemptions from prohibited transactions and included a good faith defense for reliance on administrative interpretations. Section 1028 provides in pertinent part that

> [i]n any criminal proceeding under section 1131 of this title, based on any act or omission in alleged violation of [ERISA Part 1] ..., no person shall be subject to any liability or punishment for or on account of the failure of such person to (1) comply with [ERISA Part 1] if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any regulation or written ruling of the Secretary, or (2) publish and file any information required by any provision of this part if he pleads and proves that he published and filed such information in good faith, and in conformity with any regulation or written ruling of the Secretary issued under this part regarding the filing of such reports....

Thus, section 1028 serves to outline clearly the responsibilities of those in a fiduciary relationship to employee benefit plans and to ensure that the statutory codification of the prudent man standard is not undermined by later interpretations of ERISA. In short, Congress, in section 1108, specifically outlined what would serve as a valid defense to a violation of the reporting and disclosure requirements.

This statutory good faith defense is necessary, however, only if a violation of the ERISA criminal enforcement provision in section 1131 is based only upon a finding of general intent. Under USX's construction, section 1108 would be superfluous because the government would have to prove specific intent for violations of Part 1 of ERISA; good faith is a complete defense to specific intent crimes. Although section 1108 could serve to limit the defenses that would be available if section 1131 required a finding of specific intent, this interpretation would, in effect, render "willfully" mere surplusage.

The only logical interpretation of Part 1 of ERISA is that the term "willfully" in section 1131 requires a finding of only general intent and that section 1108 provides additional statutory defenses not otherwise present for general intent crimes. Under this interpretation, sections 1131 and 1108 serve distinct purposes; the term "willfully" as used in section 1131 ensures that the act was done voluntarily and not by accident or mistake; and section 1131 provides the proper scope of defenses in accordance with the codified "prudent man" standard as determined by Congress. To interpret otherwise would render either the defenses in section 1108 or the term "willfully" in 1131 meaningless surplusage. Consequently, we conclude that the district court's charge to the jury sufficiently and accurately described the mens rea required for violations of ERISA Part 1.

## IV.

For the reasons discussed above, we find no merit in any of appellants' claims of error. Accordingly, the judgments of the district court are affirmed.

IT IS SO ORDERED.