387 F.3d 1046
 INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE 964, Defendant-cross-claimant-Appellee,
v.
BF GOODRICH AEROSPACE AEROSTRUCTURES GROUP, Plaintiff-cross-defendant-Appellant.
 No. 03-55085.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 3, 2004.
 Filed November 1, 2004.
 
 Thomas J. Kennedy, Phoenix, AZ, for the plaintiff-appellant.
 David A. Rosenfeld, M. Suzanne Murphy, and John Plotz, Oakland, CA, and James Rutkowski, Los Angeles, CA, for the defendant-appellee.
 Appeal from the United States District Court for the Central District of California; Virginia A. Phillips, District Judge, Presiding. D.C. No. CV-02-00331-VAP.
 Before KOZINSKI, O'SCANNLAIN, and SILVERMAN, Circuit Judges.
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 We must decide whether provisions of a collective bargaining agreement requiring a corporate employer to pay salary and benefits to a full-time union representative violate the federal Labor Management Relations Act.
 
 
 2
 * BF Goodrich Aerospace Aerostructures Group ("Goodrich") and the International Association of Machinists and Aerospace Workers, Local Lodge 964 ("the union") are longstanding parties to a collective bargaining agreement ("the agreement").[1] Pursuant to the agreement, union members elect a "Chief Shop Steward" who continues to draw his salary and benefits while working primarily on "the investigation and prosecution of union grievances."[2]
 
 
 3
 In May 2000, James Cifu ("Cifu") was elected Chief Shop Steward after serving nearly 20 years as a maintenance mechanic at Goodrich's Riverside, California plant. Throughout his tenure at Riverside, Cifu was an exceptionally dedicated worker who always had requested and worked as many overtime hours as possible. Indeed, during the years preceding his election, Cifu testified that he had averaged the equivalent of 365 working days per year.
 
 
 4
 Following his election and in accord with the agreement, Cifu retained his formal classification as a maintenance mechanic, and he continued to draw full salary and benefits from Goodrich. Unlike any of his predecessors, however, he also continued to volunteer for overtime maintenance mechanic work assignments—assignments that exceeded the scope of his duties as a full-time Chief Shop Steward. Even though overtime assignments were always available when Cifu volunteered, and despite the fact that Goodrich often had to hire subcontractors to perform needed mechanical work because too few of the company's regular maintenance mechanics volunteered for weekend overtime, Goodrich routinely denied Cifu's requests.
 
 
 5
 Cifu eventually filed a grievance alleging that Goodrich's refusal to assign him overtime hours on the same basis as other classified maintenance mechanics violated the agreement. An arbitration hearing was held August 30, 2001, and on January 18, 2002, arbitrator Mei Bickner ruled that Goodrich's conduct had violated the agreement. She promptly ordered Goodrich to "make the Grievant whole." On April 17, 2002, Goodrich filed suit in the Central District of California seeking to vacate the arbitration award on grounds that it violated provisions of the Labor Management Relations Act ("LMRA")[3] and the National Labor Relations Act ("NLRA").[4]
 
 
 6
 On May 14, 2002, Goodrich amended its complaint to request a declaratory judgment voiding those provisions of the agreement requiring the company to pay salary and benefits to the Chief Shop Steward, arguing that such payments were prohibited by LMRA. On June 5, 2002, the union simultaneously answered Goodrich's amended complaint and filed a cross-petition seeking confirmation of the arbitral award. The parties eventually agreed to a joint stipulation of facts regarding the Chief Shop Steward's responsibilities, and in mid-November filed competing motions for summary judgment.
 
 
 7
 On December 20, 2002, the district court entered an order denying Goodrich's motion for summary judgment and granting the union's motion for summary judgment, the effect of which was to affirm the arbitral award and to "uphold[ ] all provisions of the [agreement]" relating to Goodrich's payments to the Chief Shop Steward. Shortly after Goodrich filed a timely notice of appeal, the parties fully resolved the underlying dispute regarding the Chief Shop Steward's entitlement to overtime work. The sole claim pressed by Goodrich on appeal is that the agreement's requirement that the company fully compensate a full-time union steward violates LMRA, and the only relief the company seeks is a declaratory judgment invalidating and severing the allegedly offending provisions from the remaining agreement.
 
 II
 
 8
 Before reaching the merits of Goodrich's appeal, we must address whether this litigation continues to present a live case or controversy. Parties to a federal action must "continue to have a personal stake in the outcome of the lawsuit" at every stage of the proceedings. United States v. Verdin, 243 F.3d 1174, 1177 (9th Cir.2001), (quoting Spencer v. Kemna, 523 U.S. 1,7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990))) (internal quotation marks omitted). "This means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. at 7, 118 S.Ct. 978 (1998) (quoting Lewis, 494 U.S. at 477, 110 S.Ct. 1249). The parties' agreement that this case remains justiciable does not vitiate our responsibility to consider sua sponte our jurisdiction over this appeal. See Dittman v. California, 191 F.3d 1020, 1025 (9th Cir.1999).
 
 
 9
 The jurisdictional pressure point in this case stems from the fact that, shortly after Goodrich filed this appeal, the parties' agreement expired. One might plausibly argue that because the particular contractual clauses Goodrich wishes to have the court declare illegal are no longer operative, a declaratory judgment invalidating them would have no practical effect.
 
 
 10
 We are not so sure. Courts long "have been aggressive in determining that a [collective bargaining] dispute remains live because the disputed issue continues to shape the parties' periodic bargaining or day-to-day interaction." Kennecott Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir.1999) (citing Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n, 457 U.S. 702, 704 n. 1, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982); Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 121-25, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); Int'l Bhd. of Teamsters v. Southwest Airlines Co., 875 F.2d 1129, 1132-33 (5th Cir. 1989) (en banc)).
 
 
 11
 Thus, in holding that litigation concerning provisions of an expired collective bargaining agreement was not moot, the Tenth Circuit found particularly significant the fact that "clauses in the current [agreement] recapitulate verbatim the clauses in the [predecessor agreement] interpreted by the award," so that any resolution of issues arising out of the parties' prior agreement would likely impact their ongoing relationship. Kennecott Utah Copper, 186 F.3d at 1266. Sitting en banc, the Fifth Circuit has noted that, in renewing provisions of an agreement that had expired during the course of litigation, the parties had preserved a live controversy by "negotiat[ing] a new agreement without resolving th[eir] dispute." Southwest Airlines, 875 F.2d at 1133. And the Third Circuit has held that even where challenged provisions of a collective bargaining agreement are enacted with modifications, disputes arising out of the prior agreement are "moot only if the action or inaction of which [the plaintiff] complains is entirely unlikely to recur, or if the [union's] obligations under the [new] contract are so different from those under the [old] agreement that the parties could derive no judgment preclusion benefit from an adjudication based on past conduct." Bituminous Coal Operators' Ass'n, Inc. v. United Mine Workers, 585 F.2d 586, 599 (3rd Cir.1978).
 
 
 12
 Our sister circuits' approach is persuasive. Where parties to a legal action renew without material modification a disputed element of a collective bargaining agreement that has expired during pending litigation, such that the conduct called for by the challenged provision continues during the course of their legal action, or such that the provision or provisions in question otherwise continue to impact the parties' ongoing relationship, an action seeking a declaratory judgment concerning the legality of such provisions is appropriately subject to continued federal jurisdiction. Not only does this rule ensure that, throughout the course of litigation, the plaintiff will continue to face an ongoing injury traceable to the challenged conduct and redressable by judicial action, it promotes orderly development of the law by ensuring full judicial review of such disputes. Indeed, given that most collective bargaining agreements last just two to three years,[5] few cases seeking a declaratory judgment regarding the legality of bargaining provisions could proceed beyond district court review if the parties' mutual acquiescence in renewal of the pertinent provisions failed to preserve the live character of their controversy.
 
 
 13
 Here, the parties renewed the relevant provisions of their collective bargaining agreement during the course of this litigation, and they did so without resolving the dispute presently before us. The only arguably significant change they made to the pertinent provisions of the agreement was to codify explicitly what the arbitrator had held to be implicit in the parties' prior agreement: that the Chief Shop Steward is entitled to work overtime assignments within his formal job classification (in Cifu's case, as a maintenance mechanic) on roughly the same basis as other employees who are so classified. That alteration has little to do with the legality of the agreement's provisions requiring Goodrich to pay salary and benefits to a union steward for his regular, full-time non-shop work. And the parties' conflict over the legality of Goodrich's paying salary and benefits to the Chief Shop Steward nearly brought their contract renewal negotiations to a halt on the eve of the prior agreement's expiration. Eventually, the parties agreed simply to retain the steward compensation provisions, purportedly without prejudice to their respective litigation positions, in an effort to resolve the bargaining impasse, and with the expectation that this unfolding litigation finally would resolve their escalating conflict.
 
 
 14
 Given that Goodrich's payments to the Chief Shop Steward quite evidently continue to exert pressure on the parties' relationship, and that a declaratory judgment regarding the legality of such payments will resolve the parties' ongoing dispute, we are satisfied this litigation persists in presenting a justiciable controversy.
 
 III
 
 15
 Enacted over President Truman's veto by immediate and overwhelming votes in both houses of Congress in June 1947, LMRA sought to stabilize labor-management relations in the United States and thereby to "promote the full flow of commerce" by, among other things, "provid[ing] orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other" and "proscrib[ing] practices on the part of labor and management which affect commerce and are inimical to the general welfare." 29 U.S.C. § 141(b). To that end, LMRA § 302(a), as amended and in relevant part, declares it:
 
 
 16
 unlawful for any employer ... to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value ... to any representative of any of his employees who are employed in an industry affecting commerce....
 
 
 17
 Id. § 186(a)(1).[6] Section 302(a)'s sweeping prohibition is cabined by several important exceptions, most pertinent among them § 302(c)(1). That subsection renders the general statutory proscription inapplicable
 
 
 18
 in respect to any money or other thing of value payable by an employer to . . . any representative of[its] employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer....
 
 
 19
 Id. § 186(c)(1).
 
 
 20
 Goodrich's argument that the pertinent provisions of its agreement with the union run afoul of LMRA is straightforward. Because the Chief Shop Steward "represent[s]... employees who are employed in an industry affecting commerce," id. § 186(a)(1), Goodrich asserts that § 302(a)'s plain language prohibits the agreement's requirement that the company compensate him. Such compensation does not fall within § 302(c)(1)'s exception, Goodrich concludes, because that provision applies only to payments made to a union representative in exchange for services performed on behalf of the employer—that is, for the employee's services performed "as an employee of such employer" rather than those performed, allegedly as here, purely as a "representative of [the employer's] employees." Id. § 186(c)(1).
 
 
 21
 * The starting point for any inquiry into statutory meaning is the text of the statute itself. Where "the statute's language is plain, the sole function of the courts is to enforce it according to its terms," United States v. Ron Pair Enters., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation and internal quotation marks omitted), for "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). In analyzing a statutory text, we do not look at its words in isolation. Textual exegesis necessarily "is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (citations omitted). Thus, we look not only to "the language itself, [but also to] the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Only if this organic approach leaves ambiguity—or, indeed, if it reveals it—may we turn to extrinsic indicia of legislative intent, like legislative history. United States v. Sioux, 362 F.3d 1241, 1246-47 & n. 6 (9th Cir.2004) (citing HUD v. Rucker, 535 U.S. 125, 132, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002); W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98-99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); R.R. Comm'n of Wis. v. Chi., Burlington, and Quincy R.R. Co., 257 U.S. 563, 589, 42 S.Ct. 232, 66 L.Ed. 371 (1922); In re Sinclair, 870 F.2d 1340, 1344 (7th Cir.1989) (Easterbrook, J.); Wallace v. Christensen, 802 F.2d 1539, 1559 (9th Cir. 1986) (en banc) (Kozinski, J., concurring)).
 
 
 22
 * As noted, LMRA § 302(a)(1) renders it illegal for an employer to "agree to pay, lend, or deliver, any money or other thing of value ... to any representative of any of his employees who are employed in an industry affecting commerce." 29 U.S.C. § 186(a)(1). The union does not seriously dispute that the payments at issue in this case unambiguously seem to be covered by this language. Nor could it. The provisions of the parties' contract requiring Goodrich to pay salary and provide benefits to the Chief Shop Steward plainly constitute an "agree[ment] to pay ... money or other ... value" to a "representative of ... [Goodrich's] employees." After all, the parties have stipulated that the Chief Shop Steward investigates and files grievances on behalf of employees and participates in grievance meetings with management, supra at 1047-48 n. 2, and it is well-settled that "in using the term `representative' Congress intended that it include any person authorized by the employees to act for them in dealings with their employers." United States v. Ryan, 350 U.S. 299, 302, 76 S.Ct. 400, 100 L.Ed. 335 (1956). Like the Third Circuit—the only other court of appeals to have considered the legality of a collective bargaining agreement's requirement that the corporate employer pay full salary and benefits to a full-time union representative—it is hard for us to resist concluding that Goodrich's payments to the shop's Chief Steward fall within the plain text of the statutory proscription. See Caterpillar, Inc. v. UAW, 107 F.3d 1052, 1054 (3rd Cir.1997) (en banc), cert. granted, 521 U.S. 1152, 118 S.Ct. 31, 138 L.Ed.2d 1060 (1997), cert. dismissed, 523 U.S. 1015, 118 S.Ct. 1350, 140 L.Ed.2d 463 (1998); cf. BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union, 791 F.2d 1046, 1047-49 (2d Cir.1986) (concluding that a contractual provision providing compensation to union officers for up to four hours per day spent "conducting Union business," including meeting with management and investigating employee grievances, fell within the plain language of § 302(a)).
 
 2
 
 23
 Nonetheless, the union urges us to resist this interpretation of § 302(a) on grounds that doing so would threaten the legality of so-called "no-docking" provisions, first authorized by statute in 1935. Passed in the throes of the Great Depression, NLRA established the modern National Labor Relations Board ("NLRB"), 29 U.S.C. §§ 153-156, and sought to proscribe a variety of "unfair labor practices." Id. § 158. Of particular note, NLRA declared it
 
 
 24
 an unfair labor practice for an employer... to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the [NLRB], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay....
 
 
 25
 Id. § 158(a)(2) (second emphasis added). NLRA's language has remained unchanged for nearly 70 years, and similar provisions are included in the Railway Labor Act[7] and the Federal Service Labor-Management Relations Statute.[8]
 
 
 26
 In essence, the union argues that LMRA was not intended impliedly to repeal NLRA's acceptance of these "no-docking" arrangements, cf. Cook County v. United States ex rel. Chandler, 538 U.S. 119, 132, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) ("[R]epeals by implication are not favored.") (citation and quotation omitted), and that adopting Goodrich's interpretation of LMRA's prohibition would disrupt the national scheme of labor-management relations, within which no-docking provisions are both common and crucial to the orderly functioning of the grievance process.[9] Cf. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 739, 109 S.Ct. 2702, 105 L.Ed.2d 598 (Scalia, J., concurring in part and concurring in the judgment) ("[S]tatutes dealing with similar subjects should be interpreted harmoniously."); United States v. Fausto, 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (observing the "classic judicial task of reconciling many laws enacted over time, and getting them to `make sense' in combination").
 
 
 27
 Harmonizing these seemingly contradictory provisions may seem a daunting task.[10] But in this case, we need not engage in that potentially vexing exercise: The provisions of the agreement requiring Goodrich to compensate a full-time union representative differ from typical no-docking provisions—at least as NLRA contemplates them. In our view, the key linguistic signal in § 158(a)(2) is the phrase "without loss of time." Such language seems to authorize grievance-related compensation only for employees whose primary work responsibilities would otherwise be displaced by time spent engaged with management. After all, if an employee's only responsibility is to represent union employees in the grievance process, no "working hours" could be "los[t]" by his doing just that. The company would have no reason to "dock" the employee's pay; he would simply be doing what his contract provides.
 
 
 28
 We are therefore inclined to believe that no-docking provisions—as authorized by NLRA—become relevant only where an employee's "working hours" are devoted primarily to some productive work besides "confer[ring] with [the employer]" or otherwise representing union interests in connection with the grievance process. 29 U.S.C. § 158(a)(2). Thus, § 158(a)(2) would seemingly permit compensation to a rank-and-file assembly line worker for a few hours' time spent resolving a complaint, or to an ordinary union steward who might regularly spend a limited number of hours (per day or week, or even "as reasonably necessary") representing grieving employees, but who otherwise works with the tools of the trade.[11] That is not the case here.[12]
 
 
 29
 Notwithstanding the fact that the provisions at issue in this case differ from the no-docking provisions contemplated by NLRA, the union argues that its arrangement is precisely the kind of agreement that was well recognized by Congress and common throughout American industry at the time LMRA was enacted. Given that longstanding historical practice, and because there is no indication in LMRA's legislative history that Congress actually intended to disrupt it, the union argues it is highly unlikely that Congress really intended to outlaw such agreements—indeed, that it is "virtually inconceivable."
 
 
 30
 There are two flaws in the union's argument. First, its logic is at odds with basic interpretive principles. Under our Constitution, "[s]tatutes are law, not evidence of law." Sinclair, 870 F.2d at 1343. It is for that reason that, as Justice Holmes once noted, "We do not inquire what the legislature meant; we ask only what the statute means." Id. (quoting Oliver Wendell Holmes, The Theory of Legal Interpretation, 12 Harv. L.Rev. 417, 417-19 (1899)). To suggest that a statute's meaning depends not on what it says, nor even upon what was said about it in a staff-prepared committee print, but instead on what was not said by individual legislators during the debate surrounding its enactment thus is entirely at odds with the Constitution's careful mechanism for selecting the only text—and thus the only meaning—that matters. We simply cannot imbue Congress's unenacted (indeed, unspoken) desires with the force of law.
 
 
 31
 The second hurdle is a factual one: There is virtually no support for the union's assertion that provisions akin to the one at issue in this case were ubiquitous when Congress passed LMRA. Although data compiled as part of a major survey of labor practices at the time of LMRA's passage indicate that approximately 40 percent of collective bargaining agreements in 1947 contained some sort of no-docking provision applicable to the conduct of union representatives, see BASF Wyandotte Corp., 791 F.2d at 1050 (discussing Bureau of Nat'l Affairs, Basic Patterns in Collective Bargaining Contracts 15:127 (1st ed. 1948) [1948 BNA Survey]), nearly half of those provisions limited the amount and extent of compensable grievance time, and there is no indication that any of the remaining payment provisions were intended to compensate a full-time union steward with no other working duties. See 1948 BNA Survey 15:127.
 
 
 32
 Of course, absence of evidence is not always evidence of absence. But other relatively contemporary data seem to limit the possibility that the no-docking provisions prevalent at the time of LMRA's enactment included pay for full-time union representatives. Like the 1948 BNA Survey, a 1951 Department of Labor study found that "[s]lightly over a third of the 302 contracts [surveyed] required the employer to make some payment for employee time spent in acting as representatives for other employees in processing grievances during regular working hours." See Bertram R. Crane & Roger M. Hoffman, Successful Handling of Labor Grievances 106 (1956) (quoting United States Dep't of Labor, Bureau of Labor Statistics, Grievance Procedures in Union Agreements, 1950-51, Monthly Lab. Rev., July 1951 [1951 Department of Labor Survey]) (internal quotation marks omitted). That survey then went on to report that some 62 percent of those contracts either limited the amount and extent of compensable grievance time, or otherwise required the union and employer to share its cost:
 
 
 33
 The maximum was usually a designated number of hours per day or week, or less frequently, per month or year. Another limitation was to reimburse stewards only for time lost at certain steps in the[grievance] procedure. Some agreements limited the number of persons eligible for paid grievance activity, or limited the payment to conferences called by management. In some instances, payment for time spent investigating grievances was prohibited, although time spent in conferring with management was compensated.
 
 
 34
 Id. (quoting 1951 Department of Labor Survey) (internal quotations marks omitted).
 
 
 35
 Thus, three years after Congress enacted LMRA, only 38 percent of 33 percent of collective bargaining agreements surveyed by the Department of Labor—or about 12.5 percent of all agreements—were even open to the possibility of unlimited corporate payments to union grievance representatives. Yet even then, it is not clear that any of those payment provisions went the extra step of actually establishing a paid position for a full-time grievance representative. For as Crane and Hoffman noted in 1956, some companies had rejected the strategy of explicitly limiting the amount of time a union representative could spend handling grievances simply because they felt that doing so "often encourages union officials to use up the time needlessly." Id. at 114. It thus should come as no surprise that BNA's 1960 survey of labor agreements found "only one agreement in the [representative 400 contract] sample [that] provides for full-time company-paid union grievance representatives." See Bureau of Nat'l Affairs, Basic Patterns in Labor Agreements, 34 Lab. Arb. Rep. 931, 935 (1960).
 
 
 36
 Therefore, while we certainly are sensitive to the legislative and social context within which LMRA's prohibition against corporate payments to union representatives was adopted—regardless of what the statute's legislative history says about that context—we see little reason to think that taking its plain meaning seriously would sow dissonance in the law.[13]
 
 3
 
 37
 Having thus considered the particular language of § 302(a), its relation to other statutes dealing with similar subjects, and the context within which it was enacted, we must conclude that its proscription against corporate payments to union representatives unambiguously applies to the agreement's requirement that Goodrich compensate the Chief Shop Steward for his full-time work as a representative of Goodrich's employees.
 
 B
 
 38
 Of course, it hardly suffices to hold that LMRA § 302(a) plainly appears to prohibit the payments at issue in this case. As we have already seen, § 302(c) of the statute establishes a series of exceptions to that proscription. Of central importance here is the first such exception, § 302(c)(1), which exempts a company's payments to "any representative of [its] employees ... who is also an employee . . . of such employer, as compensation for, or by reason of, his service as an employee of such employer." 29 U.S.C. § 186(c)(1).
 
 
 39
 In concert with the usual presumption that a legislature intends different language to have different effects, see, e.g., Sosa v. Alvarez-Machain, ___ U.S. ___, n. 9, 124 S.Ct. 2739, 2754 n. 9, 159 L.Ed.2d 718 (2004), our sister circuits generally have concluded that Congress's use of the alternative formulations "as compensation for" or "or by reason of" signifies two different kinds of payments—the former, ordinary wages and salaries, and the latter, benefits such as medical leave and a pension that are not readily susceptible to characterization as "compensation." United States v. Phillips, 19 F.3d 1565, 1575 (11th Cir.1994) ("Congress, in using the alternative formulations of `as compensation for' and `by reason of' in that provision, intended to remove from the statute's prohibitions two general categories of payments to employees: (1) wages, i.e., sums paid to an employee specifically `as compensation for' work performed; and (2) payments not made specifically for work performed that are occasioned `by reason of' the fact that the employee has performed (or will perform, in the case of a current employee) work for the employer."); BASF Wyandotte, 791 F.2d at 1049 ("It appears that in using the alternative formulations `for' and `by reason of,' Congress intended to cover two general categories of employee compensation: (1) wages, i.e., sums paid to an employee specifically for the work he performs, and (2) compensation occasioned by the fact that the employee has performed or will perform work for the employer, but which is not payment directly for that work[, such] as vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like."); see also Caterpillar, 107 F.3d at 1058 (Mansmann, J., dissenting) ("The `by reason of' exception of section 302(c)(1) simply recognizes that current and former employees might have a right to receive payments from their employers that arise from their services for their employers but that are not properly classified as `compensation.' [This] exception includes pensions, 401(k) plans, life and health insurance, sick pay, vacation pay, jury and military leave pay, and other fringe benefits to which all employees may be entitled `by reason of' their service."); id. at 1072 (Alito, J., dissenting) (quoting Phillips, 19 F.3d at 1575).
 
 
 40
 The heart of the parties' dispute centers on the meaning of the final clause of the exception—that is, over what constitutes "service as an employee of [the compensating] employer." For its part, Goodrich argues that although it pays the Chief Shop Steward, he serves as an employee of the union, for whose sole benefit he works. The union counters by asserting that, beyond the fact that the Chief Shop Steward is a longtime employee of the company and remains on the payroll with a formal job classification, he provides an important service to Goodrich and he remains subject to substantial control by the company.
 
 
 41
 * At times, the union seems to suggest that the Chief Shop Steward must be an employee of Goodrich simply by virtue of the fact that he remains on the company's payroll and continues to maintain a formal job classification. We think that such an argument stretches too far. As the Third Circuit noted in Caterpillar,
 
 
 42
 The grievance chairmen cannot be considered current employees of Caterpillar who are being compensated for their current services.... Section 302(c)(1) legalizes payments to current or former employees based on their `services' as employees, not their `status' as such. Thus, the mere fact that the chairmen remain on the Caterpillar payroll and fill out the appropriate forms and time sheets to get paid is legally irrelevant.
 
 
 43
 107 F.3d at 1055. Indeed, were we to hold that formal payroll classification is sufficient to legitimate payments to a union representative, it is difficult to imagine that § 302 would have any practical effect at all. Because we must presume that, "[a]bsent clear congressional intent to the contrary, . . . the legislature did not intend to pass vain or meaningless legislation," Coyne & Delany Co. v. Blue Cross & Blue Shield of Va., Inc., 102 F.3d 712, 715 (4th Cir.1996) (citation and internal quotation marks omitted), we have no choice but to reject this argument.
 
 2
 
 44
 The core of the union's response is far more satisfying. It contends that—in a very meaningful way—the Chief Shop Steward really does serve the interests of the employer. Although he may not be operating machinery, the Chief Shop Steward plays an integral role in enforcing the terms of the collective bargaining agreement and in peacefully resolving disputes between labor and management—helping both parties avoid expensive and time-consuming litigation and the constant threat of work stoppages.[14] Thus, the union concludes, compensation delivered to the Chief Shop Steward for helping resolve grievances really is attributable to his "service" to Goodrich.
 
 
 45
 We cannot help but agree with the union's assessment that the Chief Shop Steward's work—even in his capacity as a union representative—serves the company's interests. There is, in short, a reason why virtually every single collective bargaining agreement in this country contains a grievance mechanism and why nearly all of them provide for union representation in the course of that process: Services rendered by union stewards benefit union and corporation alike.
 
 
 46
 Even so, it is not clear that the Chief Shop Steward serves "as an employee" of Goodrich simply because his work provides legitimate benefit to the company. The operative statutory definition of the term "employee" is remarkably unhelpful in defining this important term. Subject to some categorical exclusions (e.g., agricultural workers) and a proviso that workers caught in a labor dispute are still considered "employees," the relevant statute[15] states simply that "[t]he term `employee' shall include any employee, and shall not be limited to the employees of a particular employer. . . ." 29 U.S.C. § 152(3).[16]
 
 
 47
 To help fill in this statutory lacuna, the Supreme Court in NLRB v. Town & Country Electric, Inc., 516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), reiterated its understanding that
 
 
 48
 when Congress uses the term "employee" in a statute that does not define the term, courts interpreting the statute "`must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of th[at] ter[m]. . . . In the past, when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'"
 
 
 49
 Id. at 94, 116 S.Ct. 450 (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989))) (alterations and omission in original).
 
 
 50
 In turn, the Court's assessment of the common law of agency teaches that
 
 
 51
 "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." . . . Since the common-law test contains "no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."
 
 
 52
 Darden, 503 U.S. at 323-24, 112 S.Ct. 1344 (quoting Reid, 490 U.S. at 751-52, 109 S.Ct. 2166, and NLRB v. United Ins. Co. of Am., 390 U.S. 254, 258, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968)) (citations omitted, second ellipsis in original).
 
 
 53
 In this case, we think the factors most pertinent to this context weigh in favor of concluding that the Chief Shop Steward's service legitimately qualifies him as an employee of Goodrich. James Cifu has a longstanding relationship with Goodrich, having served more than 20 years as a maintenance mechanic in the company's Riverside plant. The structure of his work week is controlled by the company, and he reports to Goodrich's personnel department, which must approve any overtime, sick leave, and vacation days he wishes to take. Cifu does not appear to have the power to hire, and to our knowledge he does not pay, any assistants. He does not receive his work assignments from the union, or make frequent reports to it.
 
 
 54
 Most important to our determination, Cifu works from an office on the floor of the shop itself under the direct and immediate supervision of the corporate employer —not, for instance, in a union hall where he would be largely free from corporate control. We thus see things somewhat differently than the Third Circuit in Caterpillar, where—without analyzing whether the full-time union grievance chairmen whose corporate payments were at issue there qualified as employees of the company or really served as employees of the union, see 107 F.3d at 1065-66 (Mansmann, J., dissenting)—the court sanctioned the company's payments to full-time representatives who worked from the union hall, outside any meaningful corporate supervision (except for time-reporting requirements), and who were classified as being" on leave of absence" during the course of their union work. Id. at 1053 (majority opinion). As the union notes here, while the circumstances of Caterpillar surely suggest the possibility that Caterpillar could not have "terminat[ed], suspend[ed] or disciplined a grievance chairperson if he engages in activity that would qualify for termination, suspension or discipline for other employees," id. at 1065-66 (Mansmann, J., dissenting), there is no question whatsoever that the Chief Shop Steward in this case is subject to Goodrich's disciplinary control—in no small part due to the fact that he carries out his work on the shop floor, where his conduct is both observable by the company and clearly circumscribed by its policies and norms.
 
 
 55
 Goodrich places much reliance on the Sixth Circuit's decision in Reinforcing Iron Workers Local Union 426 v. Bechtel Power Corp., where the court held that
 
 
 56
 the District Court correctly characterized the steward's position "as either that of an agent of a labor organization or as a representative of an employer's employees, either of which violates the terms of [§ 302]." . . . It is the Union, not the employers, which exercises real control over the steward. His function is to oversee the employers' compliance with the terms of the Local Agreement. 634 F.2d 258, 261 (6th Cir.1981) (quoting Reinforcing Iron Workers Local Union 426 v. Bechtel Power Corp., 463 F.Supp. 643, 645-46 (E.D.Mich.1978)) (citations omitted). We believe Bechtel Power is readily distinguishable from this case. Of particular note, the union steward whose payments were at issue in Bechtel "receive[d] daily work assignments from and ma[de] daily reports to the business manager of Local 426" but rarely had to report to the corporate employer, id., and the district court in the case found that "the employers do not set the terms and conditions of employment in any real sense, nor do they exercise direct supervision" over the steward. Reinforcing Iron Workers, 463 F.Supp. at 646. Here, by contrast, the Chief Shop Steward neither receives his work assignments from the union nor regularly reports to it, and the record supports the conclusion that Goodrich legitimately exercises supervisory authority over him.
 
 
 57
 We likewise think that Goodrich's reliance on United States v. Phillips, 19 F.3d 1565 (11th Cir.1994), is unavailing. That case involved a simple kickback scheme where additional payments were delivered to actual "full time Union employees; the Union paid their salaries and provided their fringe benefits." Id. at 1567. Of the two union officials involved in the kickback scheme, one's connection to the company was that he had worked there 20 years prior and the other's was that he had worked there 30 years earlier. Id. And the company exercised no control or supervisory authority whatsoever over the union officials—their relationship with the company had long been severed. Id. at 1575. Phillips could hardly differ more from the facts of this case.
 
 
 58
 Considering fully the relationship between the Chief Shop Steward and Goodrich, we must conclude that Goodrich's payments fall within § 302(c)(1)'s exception covering "compensation for ... [the Chief Shop Steward's] service as an employee of such employer."
 
 IV
 
 59
 For the foregoing reasons, the judgment of the district court is
 
 
 60
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 As we elaborate below, the version of the agreement giving rise to this case expired on February 16, 2003, and the provisions at issue here were slightly modified by the successor agreementSee infra at 15401-02. For present purposes, we focus on the parties' original agreement and the stipulated facts giving rise to this litigation.
 
 
 [2]
 More specifically, the Chief Shop Steward regularly meets with workers to discuss work safety conditions and to assess Goodrich's compliance with the agreement; investigates and files grievances; and participates in grievance meetings with management. He arranges steward meetings for both training purposes and to discuss union business; communicates with union members who have been laid off or are on medical leave to ensure Goodrich is complying with its duties to them; keeps seniority rosters accurate for purposes of the agreement; and monitors personnel records as relevant to union matters. As the parties summarize it, the Chief Shop Steward's duties do not include the performance of any production and maintenance duties performed by other employees covered by the [agreement]. Other employees covered by the [agreement] work with the tools of the craft; the [Chief Shop Steward] does not do so, although he is qualified to do so. He performs the tasks and duties described above ... on a full time basis
 
 
 [3]
 LMRA is often referred to as the Taft-Hartley Act (or simply "Taft-Hartley") in recognition of its primary congressional sponsors, Senator Robert A. Taft, of Ohio, and Representative Fred A. Hartley, Jr., of New Jersey
 
 
 [4]
 NLRA is often referred to as the Wagner Act, or occasionally as the Wagner-Connery Act, in recognition of its primary congressional sponsors, Senator Robert F. Wagner, of New York, and Representative William P. Connery, Jr., of Massachusetts. On appeal, Goodrich has abandoned its claims under NLRA
 
 
 [5]
 Basing its determination on a broad survey of data regarding the duration of collective bargaining agreements, the NLRB adjusted the length of its "contract-bar rule" from two to three years in 1962Gen. Cable Corp., 139 N.L.R.B. 1123, 1127 & n. 12 (1962). The rule remains unchanged to this date. See, e.g., Madelaine Chocolate Novelties, Inc., 333 N.L.R.B. 1312, 1312 (2001) (noting the vitality of the three year contract-bar rule).
 
 
 [6]
 On a parallel basis, LMRA § 302(b) provides that "It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section." 29 U.S.C. § 186(b)(1)
 
 
 [7]
 "[N]othing in this [Act] shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time...." 45 U.S.C. § 152
 
 
 [8]
 "Except as provided in the preceding subsections of this section—(1) any employee representing an exclusive representative, or (2) in connection with any other matter covered by this chapter, any employee in an appropriate unit represented by an exclusive representative, shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest." 5 U.S.C. § 7131
 
 
 [9]
 See, e.g., Bureau of Nat'l Affairs, Basic Patterns in Union Contracts 33, 36 (14th ed.1995) (noting that every collective bargaining agreement contained in a representative national sample of some 400 labor accords contains a grievance and arbitration process, and that 50 percent of those agreements provide some form of pay to union representatives for their work in connection with that process).
 
 
 [10]
 Indeed, recognizing potential difficulties, one commentator has called for legislative reformSee Christopher J. Garofalo, Note, Section 302 of the LMRA: Make Way for the Employer-Paid Union Representative, 75 N.Y.U. L.Rev. 775 (2000).
 
 
 [11]
 See Caterpillar, 107 F.3d at 1064 (Mansmann, J., dissenting) (distinguishing payment to full-time union "grievance chairmen" from no-docking provisions in part on grounds that "employees subject to no-docking payments are more likely to do union work on an `as needed' basis. They are also more likely to be able to schedule grievance meetings and other union work at the mutual convenience of the employees and the employer. In contrast, the grievance chairmen in this case are paid full time regardless of whether there is any union work to be done. They are never available to perform services for the employer."); id. at 1073 (Alito, J., dissenting) ("`No docking' provisions differ, at least in degree, from the type of arrangement that is before us, and there are times in the law when differences in degree are dispositive."). Cf. BASF Wyandotte Corp., 791 F.2d at 1048-50 (holding that contract provisions permitting union officers and grievance representatives a limited amount of paid time for union business, including investigating grievances and consulting with management, were protected no-docking arrangements, but warning that such protections would not reach payments to "a union official who, though on the employer's payroll, performed no service as an employee"); Walt Baer, Labor Union Representatives: Allowed and Prohibited Practices 44-45 (1992) (describing as a "typical" no-docking clause Article 12 of General Electric's national labor agreement, which among "other provisions designed to control the time expended on grievances by union representatives paid for by the company," limits "payment to stewards... to two hours per week").
 
 
 [12]
 To make clear: Because we do not believe this case involves the kind of no-docking provision sanctioned by NLRA, we do not address any alleged conflict between NLRA and LMRA. The legality of no-docking provisions is not before us
 
 
 [13]
 While recognizing that the provision of full pay for full-time union representation is not an ordinary no-docking arrangement, the Third Circuit seems to have seen only a difference without a distinction: "[I]t would be strange indeed if Congress intended that granting four employees two hours per day of paid union leave is permissible, while granting a single employee eight hours per day of that same leave is a federal crime."Caterpillar, 107 F.3d at 1056. We disagree. In addition to NLRA's apparent textual limitation, we think that, given the anti-corruption/anti-conflict of interest rationale supporting these labor laws, see, e.g., Arroyo v. United States, 359 U.S. 419, 425-26, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); Ryan, 350 U.S. at 305-06, 76 S.Ct. 400, it is not inconceivable that Congress might treat these different arrangements differently. Quite simply, the potential for corporate payments to undermine the independence of a union representative may be considerably greater when the employee's entire salary and benefits are attributable to his conduct as a representative, as opposed to when compensation for a few hours spent as a representative is incidental to one's primary work as a craftsman.
 
 
 [14]
 Indeed, the union steward often quite directly serves employer interests by discouraging employees from filing meritless grievancesSee NLRB v. J. Weingarten, Inc., 420 U.S. 251, 262 n. 7, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975).
 
 
 [15]
 29 U.S.C. § 142(3) provides: "The terms `commerce,' `labor disputes,' `employer,' `employee,' `labor organization,' `representative,' `person,' and `supervisor' shall have the same meaning as when used in [the NLRA as amended by the LMRA]."
 
 
 [16]
 In full, NLRA's definitional provision states:
 The term `employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless [this Act] explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.