IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2017 Session

**IN RE ADDISON P.**

**Appeal from the Chancery Court for McMinn County**
**No. 2015-CV-38     Jerri Bryant, Chancellor**

———————————————————

**No. E2016-02567-COA-R3-PT**

———————————————————

This is the second appeal of this case.  In the first appeal, this Court vacated the judgment and remanded to the trial court only for a determination of whether mother's failure to visit the child was willful.  On remand, the trial court found that mother's failure to visit the child was willful.  We affirm the trial court's conclusion that clear and convincing evidence established the ground of willful failure to visit by an incarcerated parent.   We also affirm the trial court's determination that termination is in the child's best interest.  Consequently, we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, and THOMAS R. FRIERSON, II, JJ., joined.

Rachel Fisher, Cleveland, Tennessee, for the appellant, Marquita P.

Matthew C. Rogers, Athens, Tennessee, for the appellee, Randall P., and Jamie P.

**OPINION**

**BACKGROUND**

This is the second appeal of this case arising from a petition for termination of parental rights.   A full recitation of the factual history in this case is set out in this Court's opinion in ***In re Addison P.***, No. E2015-02102-COA-R3-PT, 2016 WL 3035650 (Tenn. Ct. App. May 20, 2016) ("***Addison I***").  In the first appeal, this Court vacated the judgment and remanded to the trial court only for a determination of whether mother's failure to visit the child was willful.  Upon remand, the proof was neither reopened nor

were there any requests for additional hearings. As a result, the facts are the same, and we restate the relevant facts here:

> The child was born in February 2013, to married parents Marquita P. ("Mother") and Randall P. ("Father").[1] Parents soon divorced and Father married Jamie P. ("Step-mother," and together with Father, "Petitioners"). On September 30, 2014, Petitioners filed a petition . . . to terminate Mother's parental rights . . . .

> \* \* \*

> Mother . . . filed a motion for supervised visitation on March 30, 2015. In her motion, Mother admitted that pursuant to the parties' divorce decree, she was required to pass a "(90) day extended opiates hair follicle drug screen" before she could have supervised visitation with the child. Mother alleged that she had provided a copy of her clean drug screen to Father and his counsel on January 23, 2015. Mother further admitted that she was served with the termination petition on September 30, 2014, while Mother was incarcerated due to a probation violation "resulting from a relapse." Mother alleged that she "did not have sufficient time to provide a clean drug screen from her relapse . . . before Father filed to terminate her parental rights." Mother attached her negative drug screen as an exhibit to her motion. Finally, Mother indicated that she intended to take a second drug screen on February 15, 2015, despite the fact that her visitation motion was filed over one month after this date. Mother did not include any documents concerning the alleged second drug screening.

> \* \* \*

> [The McMinn County Chancery Court ("the trial court")] continued Mother's motion for supervised visitation. At a hearing on May 7, 2015, however, Mother withdrew her visitation motion. The trial court entered an order on June 2, 2015, allowing Mother to have two phone calls per week with the child.

> The trial occurred on August 10 and 26, 2015. Much of the testimony at trial concerned Mother's drug use and criminal activity. According to Father, he initiated the parties' divorce shortly after the child's birth when he learned that Mother abused drugs during her

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

pregnancy. Fortunately, the child tested negative for drug dependency after her birth. On February 14, 2013, Father obtained an ex parte order from the trial court presiding over the parties' divorce ("divorce court") naming him temporary custodian of the child and limiting Mother to only supervised visitation. Initially, Father was required to supervise the visits. On April 9, 2013, the divorce court entered an order finding that Mother has a "substantial problem with substance abuse," but noted that her enrollment in a drug treatment program was "a step in the right direction." Because Mother admitted she would fail, the trial court did not require Mother to submit to a hair follicle drug screen. However, the divorce court ruled that Mother was only entitled to supervised visitation by Father or another agreed upon individual unless and until Mother "show[ed] proof that she is clear for 45 days . . . with proof of two separate drug screens paid for at [Mother's] expense, then [Mother's] father can be the supervisor for her co-parenting time." If, however, Mother "fail[ed] three drug screens at any time, then her co-parenting time will be automatically suspended." Mother was also allowed to attend all of the child's doctor's appointments. The parties eventually agreed to allow Tim Hyde, the executive director of Family Court Services, to supervise Mother's visitation.

The divorce court ultimately entered a final decree of divorce on October 16, 2013. The divorce court found that Mother had not provided any negative drug screens to the court or Father. Indeed, Mother admitted that she made no effort to comply with the trial court's previous orders concerning drug screenings, even refusing to participate in a drug screening set up and paid for by Father. Accordingly, the divorce court ruled that Mother "could take a ninety day extended opiates hair follicle drug screen and then her father could be the supervisor as long as the same was clean for all substances." Further, once Mother passes "two (2) consecutive extended opiate hair follicle drug screens, at least one hundred and eighty (180) days apart, then she shall be allowed to exercise her co-parenting time unsupervised." The divorce court ruled that Mother will be solely responsible for obtaining testing and providing information to Father and his counsel. In the meantime, Mother was permitted supervised visitation "as the parties have grown accustomed to."

On October 15, 2013, one day before the entry of the final divorce decree, however, Mother was arrested for stealing drugs from Father's police car, when he worked in the canine drug unit. As a result of this arrest, Family Court Services terminated Mother's supervised visitation. Mother testified at trial that although she called around town to find another service to supervise visitation, none were available in the immediate area. Because Father would not agree to any other supervisor, Mother's visitation

with the child stopped and never resumed. Mother eventually posted a $50,000.00 bond on the theft charge, but testified that she received the funds to do so from family members.

On April 7, 2014, Mother pleaded guilty to theft between $500.00 and $1,000.00 and was sentenced to two years supervised probation. On July 11, 2014, however, Mother tested positive for amphetamines/ methamphetamines in violation of her probation and was, therefore, arrested. Mother remained incarcerated when Father and Step-mother filed their termination petition and Mother was served with the petition while in jail. Mother's probation was subsequently revoked by order of October 3, 2014. Because Mother was only sentenced to time served, she was released from jail on October 3, 2014, with the remainder of her sentence to be served again on probation.

Mother admitted at trial, that prior to her incarceration in July 2014, she could not have passed two consecutive 90 day extended hair follicle drug screenings. Indeed, Mother testified that she has been diagnosed as an addict. Mother contended, however, that she would have been able to pass one 90 day drug screening in February 2014. Mother also testified that she has been free of drugs since her July 2014 incarceration. The record on appeal contains three negative drug screenings provided by Mother: (1) a November 8, 2014 hair follicle screening; (2) a February 24, 2015 expanded hair follicle screening; and (3) a May 27, 2015 expanded hair follicle drug screening, all of which indicated that that Mother was negative for all illegal substances tested.

Mother testified at trial that Mr. Hyde informed her that she would have to return to the divorce court before he would allow her to resume visitation under his supervision. Mother never returned to court seeking visitation, conceding that the reason she never petitioned the court for visitation after it was terminated by Family Court Services was that she could not pass a hair follicle screening. Indeed, Mother admitted that she never even attempted to take a drug screening during this time or when she was purportedly clean from drugs.

Mother testified that she made at least one attempt to regain visitation prior to the filing of the termination petition. According to Mother, she called Father in February 2014 to request visitation with the child. Mother offered that her own father could supervise the visitation. According to Mother, Father replied that he would only allow visitation as had previously been agreed, under the supervision of Family Court Services. Other than another phone call in June 2014, Mother made no

other effort to reinstate visitation until her March 2015 motion, which was eventually withdrawn. After the trial court allowed Mother to make phone calls to the child, Mother admitted that she only made one phone call in May 2015. Mother testified that it was difficult to speak with the child, who is largely pre-verbal, and that Father did not properly facilitate the phone call.

Mother's current counselor, Aaron Brown, a licensed clinical social worker with Hiwassee Mental Health Center, testified about Mother's recent treatment and progress. According to Mr. Brown, Mother has passed all administered hair follicle and urine drug screens since she entered treatment and for several months before. Mr. Brown further testified that Mother has implemented strategies to prevent drug abuse relapse, including continued treatment and removal from unhealthy relationships. Mr. Brown testified that because Mother believed that her drug use was tied to over-work at her factory job, after her June/July 2014 relapse, Mother decided not to return to work. According to Mr. Brown, he and Mother decided that it would be better for Mother not to be employed because Mother earning income could lead to her buying drugs. Mr. Brown testified, however, that Mother had recently decided to work part-time in a retail setting. Mr. Brown admitted on cross-examination, however, that he does not administer drug screens to Mother and the only evidence he has of her allegedly clean drug screens since July 2014 is Mother's statements. Mr. Brown testified that he should have been informed by Mother's probation officer if she had failed any drug screens.

Mother's current probation officer, Jim Creech, also testified. Mr. Creech testified that in his time with Mother since October 2014, he has administered two urinalysis drug screens to Mother, both of which showed no drug use in the prior four days. Mr. Creech testified that he had not administered any hair follicle drug screenings to Mother. Mr. Creech also testified that there was a period in February and March 2015 in which Mother failed to meet with him and did not attend drug counseling. Mother informed Mr. Creech that she did not like to meet at the county courthouse because Father and Stepmother both worked there and that she could not attend drug counseling due to insurance issues. After the meetings were moved to another location, Mother attended all required meetings. Mr. Creech testified that Mother is behind in paying the court costs and fees required by her probation, but that it was difficult to discern whether these issues would lead to a future violation of probation.

Mother's current husband also testified. Mother and Husband married in 2014. Husband admitted that he was convicted in 2008 of

conspiracy to distribute and possess 500 grams or more of methamphetamines. Husband was sentenced to nine years in federal prison, with part to be served in rehabilitation and on probation. The sentence was later reduced to 87 months (a little over seven years). At the time of trial, Husband was serving his sentence on probation, but testified without dispute that his probation may terminate early. Husband admitted his involvement in the crime and that he had used methamphetamines. Husband testified, however, that he had never used methamphetamines with Mother and that he is regularly drug screened due to his probation.

Husband further testified that Mother is capable of working. According to Mother, however, she has been unable to find work due to her felony record. Documents included in the record show that Mother joined a staffing agency in an effort to find work. Mother testified that all of her expenses are paid by Husband, who has gainful employment, or other family members. In addition, Mother testified that her car is owned by Husband and that Husband and her father paid for her various attorneys in her criminal and unrelated family law case. Mother also testified that she declined to apply for any government assistance because all of her needs were being met by others, including hair appointments and cigarettes.

Father testified that Mother has had no visitation with this child since October 2013 when visitation was terminated by Family Court Services. Father admitted that Mother texted him to ask for visitation in February and May 2014, but that he indicated that he would only allow supervised visitation at the visitation center because of the divorce court order. Father testified that throughout their estrangement, Mother had never offered any support or gifts for the child, which Mother denied. Father admitted that during the parties' divorce, he asked Mother not to text him anymore because of threatening messages that she was sending. Father even went so far as to file a police report regarding the threats. Father testified, however, that Mother continued to text him and that he continued to see her at the supervised visitations until those eventually terminated.

Father and Step-mother both testified as to their stable home life and the care they provide the child. Step-mother testified that she has a loving and close bond with the child and that the child knows her as her mother. Step-mother also testified that the child has a close bond with Step-mother's extended family.

At the conclusion of trial, the trial court took the matter under advisement and issued a written order on September 29, 2015. In its order, the trial court . . . concluded that "there is clear and convincing evidence of

grounds to terminate Mother's parental rights" for willful failure to visit . . . . The trial court further ruled that termination was in the child's best interest. Thereafter, Mother filed a timely notice of appeal to this Court.

*Addison I*, 2016 WL 3035650, at *1–5.

Upon remand, the trial court's order first conceded that Family Court Services' policy of refusing to supervise Mother's visits with the child due to Mother's arrest for theft, by itself, would have rendered Mother's failure to visit not willful. However, the trial court found the following:

> Mother's continued use of drugs that resulted in her arrest was willful. Her failure to request court assistance in her co-parenting was willful. Mother's failure to request co-parenting time between the time her criminal case resolved in April 2014 and her incarceration in July 2014 was willful. Based on the above and as directed by the Court of Appeals, this court makes a specific finding that Mother's conduct was willful.

Based on the combined orders, Mother's parental rights were effectively terminated. Mother appeals.

## ISSUES

Mother raises the following issues for our review, which we have slightly restated:

I. Was the trial court in error when it found a ground to terminate Mother's parental rights for willful failure to visit the child?
II. Did the trial court err in determining that termination of parental rights was in the best interest of the child?

## STANDARD OF REVIEW

As explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty

- 7 -

to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

As opined by the Tennessee Supreme Court:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*Carrington H.*, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their

- 8 -

manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

## DISCUSSION
### Willful Failure to Visit

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian" constitutes a ground for termination of a parent's parental rights. Tennessee Code Annotated section 36-1-102, in turn, provides several definitions for abandonment. In this case, the only issue that the trial court must consider upon remand was whether a ground for termination exists against Mother for willful failure to visit under Tennessee Code Annotated section 36-1-102(1)(A)(iv). Section 36-1-102(1)(A)(iv) provides:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

This Court has previously determined that: (1) Mother was incarcerated at the time of the filing of the petition; and (2) Mother had no visitation with the child in the four consecutive months prior to her incarceration, March 11, 2014, through July 10, 2014. The only issue this Court must therefore address is whether the trial court correctly found that Mother's failure to visit was willful and whether the ground of willful failure to visit was proven by clear and convincing evidence.

Mother argues, however, that her failure to visit was not willful because her efforts were frustrated by Father. In order for a court to terminate a parent's parental rights on the ground of abandonment by willful failure to visit, the parent's failure to visit must be willful. In ***In re Audrey S.***, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

- 9 -

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i[v] ) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . .

. . . Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. *In re Mazzeo*, 131 F.3d 295, 299 (2d Cir.1997); *United States v. Phillips*, 19 F.3d 1565, 1576 (11th Cir.1994); *In re Adoption of Earhart*, 117 Ohio App. 73, 190 N.E.2d 468, 470 (1961); *Meyer v. Skyline Mobile Homes*, 99 Idaho 754, 589 P.2d 89, 97 (1979). Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654;. . . . Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946, 950 (1997), or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child, *In re Serre*, 77 Ohio Misc. 2d 29, 665 N.E.2d 1185, 1189 (1996); *Panter v. Ash*, 177 Or. App. 589, 33 P.3d 1028, 1031 (2001). . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004) (No Tenn. R. App. P. 11 application filed). Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. *See Johnson City v. Wolfe*, 103 Tenn. 277, 282, 52 S.W. 991, 992 ([Tenn.] 1899); *Absar v. Jones*, 833 S.W.2d 86, 89–90 (Tenn. Ct. App. 1992); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see also In re K.L.C.*, 9 S.W.3d 768, 773 (Mo. Ct. App. 2000).

*Audrey*, 182 S.W.3d at 863–64. "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d

- 10 -

at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law de novo with no presumption of correctness. ***Id.***

The trial court found that Mother was aware since before October 2013 of her need to pass drug tests and get treatment in order to have unsupervised co-parenting time with the child. Although the trial court was "troubled" by Family Court Services' discontinuation of the supervised visitation without court approval, the trial court found that Mother did not return to court to request a change of supervisors because she knew she was unable to pass the requisite drug screens. In addition, the trial court found that Mother had been given many opportunities to rehabilitate herself but "did not manifest an ability and willingness to assume physical and legal custody of the child." Specifically, the trial court found that Mother did not visit the child, and, upon remand, found that Mother's failure to do so was willful. As a result, the trial court found that there was clear and convincing evidence to terminate Mother's parental rights on the ground of willful failure to visit by an incarcerated parent.

While Mother undisputedly had no visitation with the child in the relevant time period, it is also undisputed that Mother texted Father seeking visitation with the child in February 2014 and June 2014. The February 2014 text, however, did not occur within the relevant four-month period. Thus, it appears from the record that Mother attempted to set up visitation with the child only a single time in the relevant four-month period. In her brief, Mother asserts that Father's actions and her own indigence prevented her from having visitation with the child. A parent who attempts to visit and maintains a relationship with the child, but is "thwarted by the acts of others and circumstances beyond [her] control," cannot be found to have willfully abandoned the child. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007). Nevertheless, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." ***In re M.L.P.***, 281 S.W.3d at 393 (citing ***In re Audrey S.***, 182 S.W.3d at 864); *see also* ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006). "Conduct that amounts to a significant restraint of or interference with a parent's efforts to support or develop a relationship with a child includes . . . blocking access to the child[,] . . . keeping the child's whereabouts unknown[,] . . . or . . . vigorously resisting a parent's efforts to visit the child." ***In re Audrey S.***, 182 S.W.3d at 864 n.34.

The record does not support Mother's contention. First, we note that it is undisputed that Father never refused visitation prior to Mother's theft charge in October 2013. Indeed, Father himself supervised visitation for a period of time before the parties initiated supervised visitation at the Family Court Services pursuant to the divorce decree. Mother's visitation was suspended by Family Court Services— not by Father— because of Mother's own poor decision to steal drugs from Father's car, which violated the Family Court Services' policy. As a result, Family Court Services required that Mother return to court if she wanted to resume visitation with the child. We note that

Mother had several avenues of relief to resume visitation with the child. Specifically, based on her testimony, Mother was aware of the following: (1) that her father could supervise the visits if she were drug-free for forty-five days with two separate hair follicle drug screens; (2) that she could receive unsupervised visitation if she passed two consecutive hair follicle drug screens at least one hundred and eighty days apart; and (3) that she could resume supervised visitation at Family Court Services if she returned to the divorce court. This Court has repeatedly held that "[a] parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child." *In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010); *see also In re Jaylah W.*, 486 S.W.3d 537, 551–52 (Tenn. Ct. App. 2015), *perm. app. denied* (Feb. 1, 2016) ("It is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding a willfulness."); *In re Bonnie L.*, No. M2014-01576-COA-R3-PT, 2015 WL 3661868, at *8 (Tenn. Ct. App. June 12, 2015) (concluding that father's failure to visit was willful because he was aware of the opportunity to visit the children by merely submitting to and passing drug screens but that father "failed drug tests, refused to take tests, or made himself unavailable for such testing"); *In re Roger T.*, No. W2014-02184-COA-R3PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015) (rejecting mother's argument that her failure to visit was not willful because the trial court suspended her visitation and noting that the suspension was "the direct result of her failure to produce negative drug screens"); *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014) ("[W]hen a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit."); *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010) (rejecting father's argument that the existence of a no-contact order prevents a finding of willfulness for failure to visit because the proof indicated that father was aware that he would be permitted visitation if he passed a drug test); *State Dept. of Children's Servs. v. J.A.H.*, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005) (opining that a parent's decision to refuse to cooperate with certain conditions related to the resumption of visitation constitutes a "willful choice").

In this case, Mother conceded that she never returned to court because she knew that she could not pass a hair follicle drug screening. Indeed, during the relevant four-month period, Mother admitted that she relapsed and violated her probation. Based on our review, although Mother alleged that she could have passed one hair follicle drug screen in February 2014, Mother never provided such proof. Furthermore, we emphasize that Mother made only a single attempt during the relevant four-month period to reach out to Father concerning visitation with the child. Even this effort, however, was lacking, as Mother made no effort to provide Father proof to support her claim that she was no longer using illegal drugs. Her lack of effort to meet the conditions which would have

- 12 -

allowed her to resume visitation and her single communication attempt cannot reasonably be attributed to Father's actions.

Furthermore, we are not persuaded that Mother's indigence prevented her from satisfying the conditions that would allow her to resume visitation. In the first place, Mother's own conduct led to the suspension of the visitation that had been established at Family Court Services. In addition, Mother admitted that she did not apply for governmental assistance because all of her needs were being met, which included expenses for hair appointments and cigarettes. Apparently, expenses related to resuming a relationship with her child were not considered necessary by Mother. We note that Mother's family also helped pay a substantial $50,000.00 bond on Mother's theft charge and retain the various attorneys in connection with Mother's litigation in criminal and circuit courts. The record further indicates that the main reason Mother did not attempt to satisfy the conditions to regain visitation was because she could not pass the required drug screens, not because she could not acquire the funds from family or otherwise for those tests. As such, it appears from the record that, even had Mother obtained sufficient funds to pay for drug screenings, she would not have undertaken the screenings because she could not have passed. Her failure to obtain drug screenings is therefore not reasonably attributable to indigence. Based on all of these circumstances, we hold that clear and convincing evidence exists to terminate Mother's parental rights on the ground of willful failure to visit the child.

**Best Interest of the Child**

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a

particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Here, the trial court found that it was in the best interest of the child to terminate Mother's parental rights and for the child to be adopted. In addition, the trial court found that the child is in a stable home with two parents who want to care for her. Finally, the trial court found that Petitioners are good parents who have taken care of the child since she was born.

Mother argues, however, that clear and convincing evidence does not show that termination is in the child's best interest. Respectfully, we cannot agree. Based upon the foregoing discussion, it is clear that Mother has struggled to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in the child's best interest to be in her care. *See* Tenn. Code Ann. § 36-1-113(i)(1). Here, while Mother has made some effort to remain drug-free in the year leading up to trial, her efforts are generally "too little, too late." *See In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015) (holding that father's efforts after the termination petition was filed were "too little, too late"); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (holding that mother's improvement only a few months prior to trial was "[t]oo little, too late"). Indeed, the record shows that Mother provided three negative drug screens only after the termination petition was filed. With Mother's history of relapsing, her drug-free status of less than a year at the time of trial provides little assurance that she would be able to maintain her current sobriety long-term, especially given the fact that Mother has remarried an individual who is currently serving a federal sentence for conspiracy to distribute and possess methamphetamines. *See* Tenn. Code Ann. § 36-1-113(i)(7).

Mother also argues in her brief that, because of the unique "bi-racial connection" that she shares with the child, Mother would be in the best position to provide "support for any hardships that [the child] might have growing up bi-racial." Despite this argument, Mother failed to provide any proof other than her own unsubstantiated testimony at trial to support her contention that harm would come to the child if the child were raised in a mainly Caucasian household. To the contrary, we note that the evidence in the record supports a finding that no meaningful relationship exists between Mother and the child despite their shared heritage. *See* Tenn. Code Ann. § 36-1-113(i)(4). Here, Father has had custody of the child ever since she was born, and Mother's visitation with the child ended in October 2013, when the child was approximately eight months old. When Mother was arrested in July 2014, Mother had not visited with the child for over half of the child's life. *See* Tenn. Code Ann. § 36-1-113(i)(3). Although Mother was eventually allowed to resume contact with the child by telephone twice per week pursuant to a June 2015 order, Mother admitted that she only called once because the

- 15 -

child was unable to carry on a conversation due to her young age. According to Step-mother, however, the child knows her as her mother and the child has a close bond with Step-mother and Step-mother's extended family. Given that the child is bonded to Petitioners and appears to have all of her needs met, it appears that a change of caretakers would likely have a detrimental effect on the child. *See* Tenn. Code Ann. § 36-1-113(i)(5). Accordingly, we hold that termination of Mother's parental rights is in the child's best interest.

### CONCLUSION

The judgment of the McMinn County Chancery Court is affirmed. The termination of Mother's parental rights is affirmed. This cause is remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant, Marquita P., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE